126 F.3d 380
 31 Bankr.Ct.Dec. 893, Bankr. L. Rep. P 77,537
 In re Paolo GUCCI, Debtor.
LICENSING BY PAOLO, INC., Paolo Gucci Design Studio, Ltd.
and Trackwise Sales Corporation and Orologi Paolo,
Inc., Appellants,
v.
Frank G. SINATRA, as Trustee of the Substantively
Consolidated Estates of Paolo Gucci, et al.;
Guccio Gucci, S.p.A. and Gucci America,
Incorporated, Appellees.
 Nos. 1368, 1369, 1370 and 1371, Dockets 96-5138, 96-5142,
96-5144, 96-5146 and 96-3133.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 17, 1996.
Decided Sept. 29, 1997.
 
 Melvin Goldstein, Washington, DC (William L. Miller, Goldstein & Claxton, P.C., Washington, DC; David C. Erdos, Erdos & Maddox, L.L.C., Stamford, CT, of counsel), for Appellants Paolo Gucci Design Studio, Ltd. and Licensing By Paolo, Inc.
 Allan C. Samuels, Kenneth D. Greenwald, New York City (Lawrence J. Reina, Parker Duryee Rosoff & Haft, New York City, of counsel), for Appellant Orologi Paolo, Inc.
 Michael S. Kimm, Hackensack, NJ, for Appellant Trackwise Sales Corp.
 Jonathan L. Flaxer, New York City (John A. Bougiamas, Scott H. Wyner, Winick & Rich, P.C., New York City, of counsel), for Defendant-Appellee Frank G. Sinatra.
 Robert F. Serio, New York City (Kevin W. Barrett, Marshall R. King, Gibson, Dunn & Crutcher LLP, New York City, of counsel), for Appellee Guccio Gucci S.p.A.; Allan A. Tuttle, George M. Borababy, Patton Boggs, LLP, Washington, DC, of counsel, for Appellee Gucci America, Inc.
 Before: KEARSE and CARDAMONE, Circuit Judges, and POLLACK,* District Judge.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal represents the final chapter in the long history of Paolo Gucci's battle with appellees Guccio Gucci, S.p.A. and Gucci America, Inc. (collectively referred to as Guccio Gucci or the Gucci companies) over the use of the Gucci family name to market consumer goods--a battle that continues after Paolo Gucci's death. It began when Paolo Gucci, who was the chief designer in the family's business in Italy, left Guccio Gucci to design and market products under his own name. In 1994 he filed for Chapter 11 bankruptcy and 20 months later, he died. The bankruptcy estate's primary asset was the Paolo Gucci name, which was sold in a bankruptcy court auction pursuant to 11 U.S.C. § 363(b). During the course of the proceedings, Guccio Gucci, as well as Paolo Gucci creditors and licensees, bid for the rights associated with the Paolo Gucci name and designs. Guccio Gucci's offer of $3.65 million was determined to be the highest and best bid, and the U.S. Bankruptcy Court for the Southern District of New York (Gallet, B.J.) authorized the sale of Paolo Gucci's assets to Guccio Gucci. On appeal to the district court (Griesa, C.J.), the order authorizing the sale was affirmed.
 
 
 2
 Although appellants moved in the district court for a stay of the order authorizing the sale, they were unsuccessful in obtaining either that relief or obtaining a timely stay by this Court of the district court order. Thus, appellants in taking this appeal were in the same procedural posture as a person who shuts the barn door after the horse has been stolen. It is too late. After the sale of the bankrupt estate had been consummated, and without a stay in place, the creditors and licensees appealed. Their appeal, not surprisingly, was held to be moot. One issue does remain viable, however--the purchaser's good faith.
 
 
 3
 Appellants, Licensing by Paolo, Inc. (Licensing), Paolo Gucci Design Studio, Ltd. (Design Studio), Trackwise Sales Corporation (Trackwise) and Orologi Paolo, Inc. (Orologi), seek reversal of the sale on the ground that Guccio Gucci is not a good faith purchaser. They contend that its ongoing litigation against the Paolo Gucci marks worldwide, and particularly in South Korea during the pendency of the automatic stay, were intended to devalue the estate's assets. They assert, in addition, that Guccio Gucci acted in bad faith by using the sale to purchase assets that it knew were not part of the bankruptcy estate and by colluding with the bankruptcy trustee to effect the purchase. We conclude that although the Gucci companies' conduct was fiercely competitive, it does not constitute bad faith within the meaning of the Bankruptcy Code's § 363(m) sufficient to set aside the sale order. Hence, we affirm.
 
 BACKGROUND
 
 4
 Because neither the bankruptcy court nor the district court acting in its appellate capacity set out the complicated facts of this case, we begin our analysis with a detailed account of the events leading up to this appeal.
 
 A. Paolo Gucci's Business Ventures
 
 5
 For many years Paolo Gucci was the principal designer and stylist of goods for Guccio Gucci, an internationally known business started by his grandfather in Florence, Italy. The firm manufactures high-quality leather goods and other consumer products under the name and trademark "Gucci." A strained relationship with his cousin, the head of the Italian operation of the family businesses, culminated in Paolo Gucci's termination in 1983 and the subsequent sale of his stock. He then started his own business to market various products under his name.
 
 
 6
 Protracted trademark litigation followed in which the Gucci companies opposed Paolo Gucci's use of his name as a trademark or trade name because it would cause confusion and infringe the established Gucci marks. A July 1988 judgment by the United States District Court for the Southern District of New York (Conner, J.) prohibited him from using "Paolo Gucci" as a trademark, but allowed its use to identify him as the designer of products under separate trademarks that did not contain the Gucci name. Gucci v. Gucci Shops, Inc., 688 F.Supp. 916 (S.D.N.Y.1988).
 
 
 7
 Free to use the name "Paolo" with the phrase, "Designed by Paolo Gucci," he designed and collaborated in the design of handbags, jewelry, office furniture, lamps, sunglasses, bedding accessories, wall coverings, ladies' lingerie, plates and flatware, all to be marketed under his name. He also entered into a number of licensing agreements that allowed others to market these products under his name.
 
 
 8
 Licensees relevant to this appeal include Trackwise, which became the exclusive master licensee of all Paolo Gucci goods in South Korea and issued ten sublicenses there. One of the sublicensees, Crown Corporation, manufactures luggage, handbags, wallets and belts. Paolo Gucci also entered into a licensing agreement with Orologi, a large watch-distributor's subsidiary whose principal activity is to design, distribute and license watches. Orologi held an exclusive license to market watches designed by Paolo Gucci in the United States. In November 1992 Paolo Gucci entered into an agreement with Licensing, which was to administer his United States licensing business with the various sublicensees.
 
 B. Bankruptcy Proceedings
 
 9
 Faced with litigation arising from his failure to fulfill obligations under these various licensing agreements, Paolo Gucci filed a voluntary petition for relief under Chapter 11 on February 8, 1994. The bankruptcy court subsequently appointed appellee Frank G. Sinatra as trustee of the estate (Trustee), whose administrative duties included an investigation of the various sublicensing businesses. From the beginning the Trustee had trouble identifying and working with all of the Paolo Gucci sublicensees, and Paolo Gucci refused to cooperate in sorting out this complex problem.
 
 
 10
 On January 24, 1995 the bankruptcy court granted, over Guccio Gucci's objection, the Trustee's motion to assume the license between Paolo Gucci and Orologi. The Gucci companies had maintained that because Paolo Gucci claimed that he no longer approved the watch designs he had previously provided, Orologi's use of the designs would violate the court order requiring that products bearing the Paolo Gucci name and marks be designed by Paolo Gucci. Upon appeal the district court affirmed the bankruptcy court's decision. See In re Gucci, 193 B.R. 411 (S.D.N.Y.1996). Under the amended license, Orologi gave up its breach of contract claims against Paolo Gucci and guaranteed minimum royalty payments to the estate from August 15, 1994 to December 31, 1995.
 
 
 11
 In May 1995 Paolo Gucci started a new company with Enzo Stancato. The venture, Design Studio, was developed to become the master licensee worldwide for the Paolo Gucci name. On October 3, 1995 the Trustee signed an agreement--the Design Studio Agreement--with Paolo Gucci, Design Studio and others, under which the estate's property--including the right to the commercial use of the name "Paolo Gucci," trademarks, business names and commercial names, licensing rights, and Paolo Gucci's designs--would be conveyed to Paolo Gucci who would in turn license to the Design Studio the worldwide right to market products using his name or marks.
 
 
 12
 Despite the Design Studio Agreement, the Trustee later entered into an agreement with Trackwise under which Trackwise would purchase the exclusive licensing rights in South Korea for $1.7 million to be paid according to an agreed-upon schedule. This sale agreement, to which Design Studio consented, was intended to settle the 1993 lawsuit that Trackwise had brought against Paolo Gucci claiming he had subverted its lawful rights. The United States District Court for the Southern District of New York, the original forum of that lawsuit, approved the settlement, the terms of which included total payment of the $1.7 million and also permitted Trackwise to settle the $349,901 judgment for royalties (owed to the estate since the bankruptcy filing) with a $200,000 payment.
 
 
 13
 On March 13, 1996 the Trustee moved to terminate its rights under the Trackwise sale agreement. He asserted Trackwise had not made any settlement payments or met any of its post-petition royalty obligations. At that time unpaid royalties in the amount of $239,027 were outstanding. As an alternative to termination, the Trustee sought rejection of the license. The Trustee was prompted by his intention to pursue the original terms of the Design Studio Agreement, which provided for the revival of the Paolo Gucci licensing business with payments to the estate based upon revenues from the business. Under this plan, the Korean rights would be assigned to Design Studio.
 
 
 14
 Trackwise insisted its failure to make payments was the result of Guccio Gucci's trademark litigation against Agabang, one of Trackwise's largest sublicensees, in South Korea. After Guccio Gucci won a favorable decision in a Korean court, Trackwise's co-venturers withdrew from the business. Trackwise offered to resume the settlement agreement, if the Trustee would credit the amount that Trackwise had incurred for Korean legal expenses to defend against Guccio Gucci. Trackwise maintained that those expenses should have been incurred by the estate the assets of which were being preserved by the defense of the trade name in the Korean litigation. The Trustee rejected this offer.
 
 
 15
 After the Trustee moved the bankruptcy court for approval of its licensing agreement with Design Studio and rejection of the Trackwise license, the Official Committee of Unsecured Creditors (Creditors' Committee) moved for a judicial sale under § 363 and an order approving sale of the assets to Guccio Gucci for $3 million. The Creditors' Committee opposed approval of the Design Studio Agreement on the grounds that the estate's rights to the Paolo Gucci name were being assigned for "little or no consideration." In an effort to maximize the value received for the estate's assets, the Creditors' Committee--independent of the Trustee--had engaged in negotiations with Guccio Gucci, which resulted in a $3 million offer.
 
 C. The Sale Process
 
 16
 In light of this offer, the bankruptcy court directed that other parties be afforded an opportunity to bid for the purchase of the Paolo trade name and corresponding rights. Orologi submitted a bid for the rights to use "Paolo" and "Designed by Paolo Gucci" in connection with Paolo Gucci designs for merchandising in the United States. It pledged royalties on annual aggregate sales for five years, providing for a sum of at least $3 million. Because the various proposals were fundamentally different in pricing and structure, the bankruptcy court issued a bidding conditions order, dated May 1, 1996, governing the terms of the auction to facilitate comparison of the competing offers. The parties had sought clarification on a number of issues prior to the sale, which the bankruptcy court declined to address in the bidding conditions order. A motion filed by Design Studio alleged that the designs created by Paolo Gucci after the bankruptcy filing belonged to it and did not constitute part of the bankruptcy estate to be sold. Orologi had moved to stay the auction, complaining that the bidding conditions order was entered without the Trustee having made any effort to marshall the existing designs that had been distributed to companies throughout the world.
 
 
 17
 On May 15, 1996 the auction of Paolo Gucci's assets proceeded before Bankruptcy Judge Gallet. The bidding categories included U.S. rights only, Korea rights only, the world except for Korea, and world rights. The Design Studio offered $575,000 for U.S. rights only. Crown, Trackwise's Korean sublicensee, bid $1.7 million for the Korean rights. For world rights except Korea, Orologi bid $200,000 in cash plus royalties over a five-year period, estimated at $3 million. Bidders for world rights included Guccio Gucci at $3.3 million, Crown at $2 million, and the Design Studio, which augmented its original agreement with the Trustee to an aggregate bid of $8 million payable over a 10-year period.
 
 
 18
 In his analysis of the competing bids, the Trustee rejected the Crown bid because there was no security to back up the future payments, and recommended the bankruptcy court accept Design Studio's offer as the highest and best. It reasoned that several "intangible" factors pointed in favor of that bid over Guccio Gucci's: (1) the public interest in keeping the business alive; (2) the administrative burden of claims by sublicensees in the event that Guccio Gucci cancels all licenses; and (3) the potential for inequity vis-a-vis Crown in Korea.
 
 
 19
 On May 20, 1996 the bankruptcy court held a hearing to consider the Trustee's recommendation. On the second day of the hearing, the Trustee withdrew his approval of the Design Studio bid and announced that the Gucci companies were the highest and best bidders for the Paolo Gucci assets. In response to this equivocation, Judge Gallet reopened the bidding process, concluding that the Trustee's analysis of the bids may not have been thorough enough because of the complicated nature of the bids made and the brief time the bankruptcy court had allowed for analyzing them. Additionally, the bidders indicated a willingness to improve their bids. On August 2, 1996 bidding was reopened to permit bidders to explain their existing offers, make increases, or restructure those offers--subject to the limitation that no offer could be withdrawn or reduced.
 
 
 20
 Crown maintained its bid of $1.7 million for the Korean rights. Orologi bid $3,115,000 for the United States rights with a $200,000 cash payment up front and eight annual payments of $50,000 plus interest, guaranteed by Orologi's parent corporation. In addition, Orologi's bid included a proposal to pay 3 percent of gross revenues (which it estimated to be $2.4 million in royalties), conditioned on the post-petition designs being included in the bankruptcy estate and a waiver of its existing claims against the estate (which it valued at a minimum of $115,000). Orologi also submitted a bid for world rights, except Korea and the U.S., that included the same terms as its U.S.-only bid.
 
 
 21
 Design Studio bid $4.5 million, including $2.7 million up front, the greater of 3 percent of its royalties or $800,000 to be paid one year after the closing (which was secured by a letter of credit), the greater of 3 percent royalties or $600,000 to be paid two years after the closing (which was secured by lien in the revenue stream from the license agreements), and $400,000 paid on the third anniversary of the closing. This bid reflected cooperation between the Design Studio and Crown, which put up some of the cash to be paid. Guccio Gucci increased its bid to $3.65 million, offering $2.65 million up front and $1 million upon satisfaction of certain conditions of sale, including rejection of licenses with Trackwise and Licensing as well as the inclusion of post-petition designs as part of the estate's assets to be sold.
 
 
 22
 On August 9, 1996 the Trustee again recommended the Gucci bid. The Trustee did not consider the Design Studio bid because it did not back up the bid with a check for its down payment as required by the bankruptcy court, and it clarified its offer as not including the valuable Korean sub-sublicenses in the three percent royalties payment to the estate. Trackwise attempted to submit a belated bid of $2 million for the Korean rights and a bid of $4 million for global licensing rights on October 11, 1996. These bids were apparently funded by co-venturers, rather than Trackwise's own assets, and were eliminated from consideration.
 
 
 23
 On October 15, 1996 the bankruptcy court issued an order endorsing the Trustee's decision and approving the sale to Guccio Gucci, whom it found to be a good faith purchaser. The sale order approved termination of Trackwise's Korean license in its entirety and the rejection of debtor's license with Licensing. Following an earlier decision, dated October 9, 1996 in which Judge Gallet had concluded that the post-petition designs were property of the estate, the sale order prohibited the use of the Paolo Gucci trade name and required anyone possessing any Paolo Gucci designs to surrender them to Guccio Gucci, except to the extent that Orologi had obtained such rights from the Trustee.
 
 D. Appeal from the Sale Order
 
 24
 Design Studio, Licensing, Orologi, Trackwise and Crown appealed the bankruptcy court's approval order to the district court. The appeal was expedited and on November 21, 1996, the district court issued a ruling from the bench affirming the bankruptcy court's sale of the assets under § 363 as well as its decision holding that the post-petition designs were part of the estate. It declined to stay the sale order pending further review to this Court, and the sale was therefore consummated on November 22, 1996.
 
 
 25
 Appellants, not including Crown, brought their case to this Court. On December 4, 1996 another panel dismissed the appeal from the district court as moot except as to the issue of whether Guccio Gucci is a good faith purchaser. Licensing by Paolo, Inc. v. Sinatra (In re Gucci ), No. 96-5138 (2d Cir. Dec. 24, 1996), opin. at 105 F.3d 837 (2d Cir.1997). At the oral argument before this panel on the question of good faith, the parties emphasized the need for an immediate decision in light of the impending resolution of the Korean litigation as well as Guccio Gucci's option to withdraw its offer if the sale was not completed by December 31, 1996. On December 24, 1996 we filed a summary order upholding the district court's affirmance of the bankruptcy court's sale order and stated we would issue an opinion explaining our reasons later. We now set forth those reasons.
 
 ANALYSIS
 
 26
 Section 363 of the Bankruptcy Code authorizes the use, sale or lease of property of the estate in the course of a corporate reorganization under Chapter 11. A sale of a substantial part of a Chapter 11 estate other than in the ordinary course of business may be conducted if a good business reason exists to support it. Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir.1983). Purchasers of these assets are protected from a reversal of the sale on appeal so long as they acted in good faith. 11 U.S.C. § 363(m).
 
 
 27
 Section 363(m) maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property. Anheuser-Busch, Inc. v. Miller (In re Stadium Management Corp.), 895 F.2d 845, 847 (1st Cir.1990); In re Sax, 796 F.2d 994, 998 (7th Cir.1986). We have long recognized the value of finality in judicial sales. See In re General Insecticide Co., 403 F.2d 629, 631 (2d Cir.1968). Because appellants were denied a stay pending appeal of the sale order and the sale itself has been consummated, the only question before us is whether the buyer, Guccio Gucci, is a good faith purchaser under § 363(m). Licensing by Paolo, Inc. v. Sinatra (In re Gucci ), 105 F.3d 837, 839 (2d Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997).
 
 I Standing to Challenge the Sale of Assets
 
 28
 The Trustee and Guccio Gucci contend we need not reach the question of good faith because appellants lack standing to appeal. Although the district court, acting in its appellate capacity, did not specifically address the question, it did make--by reaching the merits of the sale order--an implicit ruling that appellants had standing to appeal the sale. Whether a claimant has standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). We are compelled therefore to consider this matter directly.
 
 
 29
 The present Bankruptcy Code does not contain any express restrictions on appellate standing. To have standing to appeal from a bankruptcy court ruling in this Circuit, an appellant must be an "aggrieved person," a person "directly and adversely affected pecuniarily" by the challenged order of the bankruptcy court. Kabro Associates v. Colony Hill Associates (In re Colony Hill Associates), 111 F.3d 269, 273 (2d Cir.1997); International Trade Admin. v. Rensselaer Polytechnic Institute, 936 F.2d 744, 747 (2d Cir.1991). Such a test is stricter than Article III's "injury in fact" test for standing. See Kane v. Johns-Manville Corp., 843 F.2d 636, 642 n. 2 (2d Cir.1988) (noting that "injury in fact" test does not require financial injury, nor does it require direct effect); In re Victory Mkts., Inc., 195 B.R. 9, 15 (N.D.N.Y.1996). The stringency of our rule is rooted in a concern that freely granting open-ended appeals to those persons affected by bankruptcy court orders will sound the death knell of the orderly disposition of bankruptcy matters. See In re El San Juan Hotel, 809 F.2d 151, 154 (1st Cir.1987).
 
 
 30
 Creditors ordinarily have standing to appeal bankruptcy court orders that make a disposition of estate property since that sort of order directly affects the funds available to meet their claims. See In re Johns-Manville, 843 F.2d at 642. In contrast, unsuccessful bidders usually lack standing to challenge a bankruptcy court's approval of a sale. Colony Hill, 111 F.3d at 273. With this legal background in mind, appellees argue that Orologi, Trackwise, and Design Studio are disappointed bidders who lack standing and Licensing has alleged no injury sufficient to establish its standing. We consider the standing of these four appellants.
 
 A. Trackwise and Orologi
 
 31
 To assert that Trackwise and Orologi lack standing is somewhat strained. Although both are creditors of the bankruptcy estate, as conceded by the Trustee in his appellate brief, appellees maintain Trackwise and Orologi lack standing because they are appealing as disappointed bidders, not as creditors. As evidence of their improper motives, Guccio Gucci states that none of the other unsecured creditors oppose the sale.
 
 
 32
 Appellees urge that a creditor's standing to appeal should be limited to a claim that the highest bid was not accepted. We think that claim implicit in the challenge to the purchaser's good faith. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir.1986) (good faith inquiry considers whether there is fraud, collusion or an attempt to take unfair advantage of the other bidders). Orologi and Trackwise in fact declare that Guccio Gucci's conduct diminished the value of the estate's assets, thereby limiting their recovery as creditors. The other unsecured creditors' support for the sale order does not refute Trackwise's and Orologi's status as creditors. Nor is our decision swayed by the fact that these two appellants are motivated, at least in part, by the hope that they may purchase the estate's assets at a resale. In sum, Orologi and Trackwise have standing to appeal Guccio Gucci's status as a good faith purchaser.
 
 
 33
 Because Trackwise and Orologi have standing to appeal as creditors, we need not address whether they would also have standing as unsuccessful bidders. But, we observe that, contrary to appellees' understanding of the law, the rule that purports to deny standing to unsuccessful bidders is not unvarying, Colony Hill, 111 F.3d at 273, but is affected by those concerns the Bankruptcy Code was enacted to protect. Thus, an unsuccessful bidder challenging the intrinsic fairness of the sale has standing to appeal an order directing that sale. See Ross v. Kirschenbaum (In re Beck Indus., Inc.), 605 F.2d 624, 634 n. 13 (2d Cir.1979).
 
 B. Design Studio
 
 34
 Design Studio contends it enjoys creditor-like status based on its intention to assert a claim for substantial contribution under 11 U.S.C. § 503(b)(3) and (4). No such claim has been filed. The Bankruptcy Code defines a creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). Because Design Studio's putative claim arose after the bankruptcy petition was filed, it is not a creditor.
 
 
 35
 It also asserts standing based upon its claim that it owned property, licensing rights to Paolo Gucci designs, sold under § 363(b) as part of the bankruptcy estate. Design Studio apparently thinks its agreement with Paolo Gucci conferred licensing rights in the designs created by Paolo Gucci after his Chapter 11 filing. It argues that its property interests in the licensing agreement were harmed when, in the sale order, the bankruptcy court directed it to cease exercising its rights under the licensing agreement by turning over all post-petition designs and discontinuing use of the Paolo Gucci mark. Such allegation sufficiently claims direct harm so as to qualify Design Studio as aggrieved by the sale order.
 
 
 36
 Its direct challenge to the bankruptcy court's inclusion of post-petition property within the bankruptcy estate sale is moot. We cannot take any action that affects the judicially-authorized sale if the purchaser acted in good faith and no stay was granted. In re Gucci, 105 F.3d at 840; see also In re Stadium Management Corp., 895 F.2d at 848 (for the purpose of § 363(m)'s mootness rule, motions related to conditions of a sale are part of the § 363 sale and objections to their resolution are rendered moot absent a stay of the sale because the related motions cannot be separated from the sale).
 
 
 37
 However, to the extent that Design Studio's argument places Guccio Gucci's good faith at issue, its appeal is not moot. The allegation that the Gucci companies acted in bad faith by usurping Design Studio's assets in the bankruptcy estate implicates the intrinsic fairness of the sale. Moreover, when such usurpation occurs, only the owner of the property--not the purchaser, the creditors, or the debtor--has an interest in challenging this action, which, if successful, adds to the overall value of the estate. Hence, Design Studio has standing to the extent that it alleges that Guccio Gucci acted in bad faith by conditioning the sale of assets upon the rejection of a trademark license outside the scope of the bankruptcy estate.
 
 C. Licensing
 
 38
 Licensing avers it is directly aggrieved by the bankruptcy court sale order because that order precludes it from exercising its right to license the pre-petition designs of Paolo Gucci. The sale order rejected this license and specifically ordered parties to cease using any design created by Paolo Gucci and any mark associated with the Paolo Gucci name.
 
 
 39
 Licensing has a reasonably strong argument that rejection of its licensing contract does not eliminate the transfer of the property right created under it. See Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 138 B.R. 687, 711 (Bankr.S.D.N.Y.1992) (rejection of executory contract does not terminate nonbankruptcy rights in specific property). Again, although the question of whether the bankruptcy court erred in issuing such an injunction is moot because we are powerless to undo or rewrite the terms of the consummated sale, we hold that Licensing has standing to appeal the sale to the extent it alleges that Guccio Gucci acted in bad faith by requesting the bankruptcy court in its order to destroy a legally protected right Licensing purports to have.
 
 II Good Faith
 
 40
 Because all the appellants have standing to appeal, we pass now to the issue of good faith. In its approval of the sale of the estate's assets, the bankruptcy court found that Guccio Gucci was a good-faith purchaser within the meaning of § 363(m). Bankruptcy courts routinely make a finding of good faith at the time of the § 363 sale approval. Although we have not squarely faced this issue, some courts read the Bankruptcy Code to require such a finding. Compare Abbotts, 788 F.2d at 149-50 (good-faith finding is required) with Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.), 846 F.2d 1170, 1174 & n. 1 (9th Cir.1988) (bankruptcy court may, but is not required to, make finding of good-faith purchaser); see also New York Life Ins. Co. v. Revco D.S., Inc. (In re Revco D.S., Inc.), 901 F.2d 1359, 1366 (6th Cir.1990) (explicit finding required for § 364(e)). Moreover, practitioners counsel parties involved in a § 363 sale to condition their offer to purchase on the bankruptcy court's including in its order approving the sale a specific finding of the purchaser's good faith. See, e.g., David A. Warfield, Bankruptcy Bazaar: Purchasing Assets out of Bankruptcy Court, 51 J. Mo. B. 283, 286 (1995); Alesia Ranney-Marinelli, Asset Sales in a Chapter 11 Bankruptcy Case, 738 PLI/Comm. 89, 126 n. 26 (PLI Commercial Law and Practice Course Handbook Series, No. A4-4498, 1996) (same). Guccio Gucci conditioned its bid in this fashion and the bankruptcy court made an express finding that it had acted in good faith.
 
 
 41
 We recognize that the district court, acting in its capacity as an appellate court in a bankruptcy case, affirmed this decision. Yet, it is our task to review the factual findings and legal conclusions of the bankruptcy court independently, exercising de novo review over the legal standards applied and examining its findings of fact for clear error. Lebovits v. Scheffel (In re Lehal Realty Assocs.), 101 F.3d 272, 276 (2d Cir.1996). The "good-faith purchaser" determination is a mixed question of law and fact. See Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.), 992 F.2d 7, 8 (1st Cir.1993); Abbotts, 788 F.2d at 147.
 
 
 42
 Although the Bankruptcy Code does not define the meaning of "good-faith purchaser," see Lawrence P. King et al., 3 Collier on Bankruptcy p 363.11 at 363-64 (15th rev. ed.1997), most courts have adopted a traditional equitable definition: "one who purchases the assets for value, in good faith and without notice of adverse claims." Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir.1985). We need not address the "for value" claim directly. Generally speaking, a purchaser who pays 75 percent of the appraised value of the assets has tendered value, Abbotts, 788 F.2d at 149; In re Rock Industries Machinery Corp., 572 F.2d 1195, 1197 n. 1 (7th Cir.1978), but where the purchaser is found to have acted in good faith the auction price suffices to demonstrate that the purchaser paid "value" for the assets, Colony Hill, 111 F.3d at 276. As a consequence, because none of the parties point to anything in the record that indicates the appraised value of the assets sold, the crux of this appeal is Guccio Gucci's good faith.
 
 
 43
 Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." In re Rock Indus., 572 F.2d at 1198; Willemain v. Kivitz, 764 F.2d at 1023; Ewell v. Diebert (In re Ewell ), 958 F.2d 276, 281 (9th Cir.1992); Tompkins v. Frey (In re Bel Air Assocs., Ltd.), 706 F.2d 301, 305 n. 11 (10th Cir.1983).
 
 
 44
 Collectively, appellants' arguments that Guccio Gucci was not a good-faith purchaser is less a claim of fraud, collusion or unfair advantage in the bidding process and more an attack on its general business practices. The appropriate scope of inquiry regarding a purchaser's good faith is not nearly so broad. As just defined, the good-faith analysis is focused on the purchaser's conduct in the course of the bankruptcy proceedings. This includes the purchaser's actions in preparation for and during the sale itself. That is, the good-faith requirement prohibits fraudulent, collusive actions specifically intended to affect the sale price or control the outcome of the sale.
 
 
 45
 Our understanding of the scope of the good-faith inquiry is informed by the reasoning of the Third Circuit in Abbotts. There, unsuccessful bidders alleged that the purchaser ADC, in exchange for a lucrative employment offer to Abbotts' principal officer, manipulated the timing of Abbotts' bankruptcy filing so that the bankruptcy court had no choice but to accept an interim agreement between ADC and Abbotts, the terms of which were designed to preclude any truly competitive bidding for debtor Abbotts' assets at the subsequent auction. The court recognized that, if these allegations were true, "the situation was ripe for collusion and interested dealing" between the purchaser and the debtor, which could preclude a finding of good faith. 788 F.2d at 149. Although the conduct in question was alleged to have begun before the bankruptcy proceedings were initiated, the relevant inquiry still remained whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders.
 
 
 46
 Our recent interpretation of the related 11 U.S.C. § 363(n) complements this analysis. While § 363(m) protects a party who purchases in good faith, § 363(n) empowers the Trustee to avoid a sale if the sale price resulted from an understanding between potential bidders at the sale. This section provides a more direct statutory prohibition on the conduct of the purchaser. In Lone Star Indus., Inc. v. Compania Naviera Perez Companc, S.A.C.F.I.M.F.A. (In re New York Trap Rock Corp.), 42 F.3d 747 (2d Cir.1994), we confirmed § 363(n)'s plain meaning that there had to be an agreement among bidders to influence the sale price--and that the influence on the sale price not be simply a by-product or unintended consequence--for the agreement among potential bidders to come within the prohibition of § 363(n). Id. at 752.
 
 
 47
 As proof of Guccio Gucci's bad faith appellants point to the following: (a) its worldwide litigation challenging the use of the Paolo Gucci marks, which effectively devalued those trademarks as assets; (b) its efforts to gain control of assets beyond the scope of the bankruptcy estate; (c) its alleged collusion with the Trustee; and (d) its purchase of the estate's assets with the intent to destroy them in violation of public policy. We consider each of these points in turn.
 
 
 48
 A. Litigation and Administrative Proceedings
 
 
 49
 The purchaser's bad faith is first evidenced, appellants maintain, by the litigation it conducted to devalue the Paolo Gucci assets, its violation of the automatic stay during its pursuit of the litigation and administrative proceedings in Korea, and its harassment of Korean department stores that were Trackwise's sublicensees. Appellants further declare that because Guccio Gucci's perceived value of owning the trademarks did not depend upon their future marketability, its actions were designed to enable it to step in and buy the trademarks for a price less than that for which they would have otherwise sold.
 
 
 50
 We do not think the record shows that Guccio Gucci's litigation and alleged harassment campaign was specifically directed at controlling the sale price or taking unfair advantage of the bidders. Instead, the record indicates that, at least from the time Paolo Gucci began his own business, Guccio Gucci had adopted an aggressive litigation strategy to protect its own trademarks from infringement. This ongoing pattern of litigation undermines the argument that the Gucci companies instituted trademark prosecutions with the intent to control the sale price of the bankrupt estate's assets. Rather, it is a continuation of their established business strategy. Further, this conduct was widely known to all bidders, none of whom complained about its effect on their ability to bid at the time when their bids were submitted.
 
 
 51
 Moreover, we are reluctant to infer that the Gucci companies' trademark prosecutions artificially depressed the inherent value of the Paolo Gucci name as a business asset. The value of a business engaged in marketing a trademark is limited to its legal right to use the mark. The record demonstrates that Guccio Gucci was successful in its trademark prosecutions against the Paolo Gucci businesses and licensees around the globe. The value of Paolo Gucci trade name was limited by the legal claims that it infringed the Gucci companies' trademarks. In light of the companies' persistent and successful use of trademark law to protect their own name, a reasonably prudent business person would have calculated the associated costs and risks in its valuation of a Paolo Gucci trade name, whether or not the infringement prosecutions were being pursued at the time.
 
 
 52
 This view finds support in the testimony of the president of Crown, a Trackwise sublicensee, who stated his company was willing to bid much more than the bid it offered at the auction--"close to" $3 million--if it could be guaranteed protection "from interference and harassment for a number of years." In sum, aggressive protection of trademarks is the reality of the designer retail business, and we do not view it as "flagrant misconduct" during this sales transaction.
 
 
 53
 Similarly, Guccio Gucci's alleged violations of the automatic stay provision do not undermine the good-faith determination. The Bankruptcy Code's automatic stay provision enjoins, inter alia, "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement [of the bankruptcy]" and "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. §§ 362(a)(1) & (a)(3). We have ruled that an action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the automatic stay provision. In re 48th St. Steakhouse, Inc., 835 F.2d 427, 431 (2d Cir.1987).
 
 
 54
 Appellants insist that the Gucci companies' continued pursuit of administrative proceedings and litigation against Paolo Gucci licensees repeatedly violated the stay provision. Apparently recognizing that administrative and judicial proceedings in Korea were subject to the stay, the companies successfully applied to the bankruptcy court to have the stay lifted to commence one administrative proceeding in Korea. It nonetheless subsequently commenced litigation against Agabang, a Korean sublicensee of Paolo Gucci, and a second administrative proceeding without permission of the bankruptcy court. The Trustee filed a civil contempt motion for these alleged violations, which was later withdrawn as part of the approved sale. In addition, Guccio Gucci conceded that it violated an order of the bankruptcy court that permitted it to file oppositions to trademark applications in Korea, but prohibited it from listing specific claims in the filings.
 
 
 55
 Appellants urge us to adopt a per se rule that a party's violation of the automatic stay renders it incapable of being a good faith purchaser under § 363(m). We decline that invitation for two reasons. First, we have already held that the actions themselves, which are described as violations of the stay, did not undermine Guccio Gucci's status as a good faith purchaser within the meaning of § 363(m) because they were not aimed at influencing the price of the sale. Moreover, even if the actions did violate § 362(a), the automatic stay provision includes its own effective policing measures. A willful violator of the stay may be held in contempt and is liable for compensatory and punitive damages. § 362(h).
 
 
 56
 B. Use of the Bankruptcy Sale to Gain Control of Assets Beyond the Scope of the Estate
 
 
 57
 Design Studio maintains Guccio Gucci also acted in bad faith by conditioning its offer on the inclusion of property in the bankruptcy estate which it knew properly belonged to Design Studio. Design Studio's position is based on an agreement it made with Paolo Gucci after his bankruptcy filing under which he conferred a license on Design Studio to market all designs created after the filing of his bankruptcy petition. In its October 9, 1996 decision the bankruptcy court held that any post-petition designs created by Paolo Gucci are to be marketed under the Paolo name and trademark and are property of the estate. The October 15, 1996 order approving the sale of assets to Guccio Gucci listed post-petition designs as included in the sale.
 
 
 58
 We emphasize that whether the post-petition designs were part of the estate and whether the bankruptcy court erroneously authorized the sale of property outside the scope of that estate are questions that are now moot. In re Sax, 796 F.2d at 997-98 (argument challenging § 363 sale on ground property sold did not belong to debtor's estate is moot absent a stay). Section 363(m) limits appellate review of a consummated sale whenever the sale is authorized under § 363(b)--regardless of the merits of legal arguments raised against it. Because the sale was not stayed, § 363(m) permits us to only consider the issue of good faith. Thus, we are unable to reach or decide the question of the ownership of post-petition designs.
 
 
 59
 In addition, the record does not indicate that Guccio Gucci's conduct constituted bad faith. In the context of this case's complicated facts and issues of first impression, there was at least a colorable claim that the bankruptcy estate owned the post-petition designs created to bear Paolo Gucci's name and trademark because they were so inexorably tied to the existing licensing business that it would be impossible to separate the two. See In re Gucci, 202 B.R. 686, 689-90 (Bankr.S.D.N.Y.1996). The Trustee expressed his view that the estate owned the designs, and the representatives of decedent Paolo Gucci's estate did not assert any ownership interests in them. Moreover, Orologi, a competing bidder whom Design Studio does not allege colluded with Guccio Gucci, requested the same condition in its bid. Finally, although Guccio Gucci included the post-petition designs condition in its offer, its request was publicly made and no evidence of deceit or fraud was shown. Hence, the imposition of the subject sale condition did not constitute bad faith.
 
 
 60
 C. Collusion between Trustee and Guccio Gucci
 
 
 61
 Trackwise avers that Guccio Gucci acted in bad faith by colluding with the Trustee to effect the sale of the assets to it. Trackwise offers two decisions by the Trustee as evidence of this alleged collusion. First, it points to the Trustee's decision to seek approval to reject Trackwise's license as required by Guccio Gucci's bidding conditions. Guccio Gucci ultimately waived this condition. The trustee informed the bankruptcy court of this waiver and withdrew its motion in open court. The bankruptcy court had previously approved termination of the Trackwise license in accordance with an August 23, 1995 order that had set forth the conditions of the Trackwise settlement. The order specifically stated that if Trackwise failed to make the payments required by the order, the Trustee was authorized to settle an order terminating the license. In its mandamus petition, Trackwise concedes that it was in default. From this concession, we can conclude that the decision to seek termination and/or rejection of the Trackwise license was a reasonable business decision on the part of the Trustee.
 
 
 62
 Trackwise also points to the Trustee's withdrawal of its 1995 contempt motion in consideration of a modest fee stipulation with Guccio Gucci. From what Trackwise labels evidence of collusion, we on the contrary infer the Trustee's prudent effort to facilitate a sale that he determined to be in the best interest of the estate and its creditors.
 
 D. Public Policy Considerations
 
 63
 There is no question that some consequences of this sale are unsettling. As a result of it, several businesses that have made substantial investments to develop a market for Paolo Gucci goods will suffer. However, contrary to arguments made by appellants, Guccio Gucci's intent to terminate trademark licenses and destroy the trademarks themselves did not constitute bad faith within the meaning of § 363(m), nor does it violate public policy.
 
 
 64
 Any apparent inequities in this case are as much an indictment of bankruptcy law generally as they are of the Gucci companies' intended use of the assets, see Stuart M. Riback, The Interface of Trademarks and Bankruptcy, J. Proprietary Rts., June 1994, at 2, 3-6; David M. Jenkins, Licenses, Trademarks, and Bankruptcy, Oh My!: Trademark Licensing and the Perils of Licensor Bankruptcy, 25 J. Marshall L.Rev. 143, 155-59 (1991); Richard Lieb, The Interrelationship of Trademark Law and Bankruptcy Law, 64 Am. Bankr.L.J. 1, 35-38 (1990).
 
 
 65
 Yet neither inequities or use of the estate's assets is relevant to our limited review of Guccio Gucci's conduct in preparation for and during the course of the sale proceeding. The Bankruptcy Code allows the trustee, subject to court approval, to reject or terminate executory contracts. 11 U.S.C. § 365(a). This provision was perceived as having a chilling effect on intellectual property licensing because it authorized the stripping of an innocent licensee's rights--rights which are central to the licensee's ongoing business. S. Rep. 100-505, at 4 (1988), reprinted in 1988 U.S.C.C.A.N. 3200, 3203. In response, Congress enacted § 365(n) to give these licensees the option to retain certain rights despite the trustee's rejection of the license. Pub.L. No. 100-506, 102 Stat. 2538 (1988). However, the Act's protection is limited to the Bankruptcy Code's definition of "intellectual property"--which does not include trademarks. 11 U.S.C. § 101(35)(A) (intellectual property includes patents, copyrights, trade secrets, and semi-conductor mask works). Consequently, it may be seen that Congress specifically excluded trademark licensees from this protection accorded other intellectual property licensees. See S. Rep. 100-505, at 5 (protection of trademarks deliberately not conferred).
 
 
 66
 While equitable concerns noted above may allow reversal of a bankruptcy order to reject a specific license in a specific instance,[1] the limited question before us is whether Guccio Gucci purchased the assets in good faith. We conclude that Guccio Gucci's intended use of the assets purchased is not relevant to the good faith inquiry, and therefore we agree with the bankruptcy court's determination that Guccio Gucci is a good faith purchaser within the meaning of § 363(m).
 
 CONCLUSION
 
 67
 For the reasons stated above, we affirmed the order of the district court that affirmed the bankruptcy court's determination of Guccio Gucci's status as a good faith purchaser within the meaning of § 363(m).
 
 
 
 *
 Hon. Milton Pollack, Senior Judge, United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The effects of a rejection of a trademark licensing agreement are a matter that remains to be litigated. To date, this Court has not addressed whether a § 365 rejection operates as a kind of avoiding power to bring back into the estate a license of the debtor's trade name or trademark that was conferred by the debtor prior to its bankruptcy filing. See In re Lavigne, 114 F.3d 379, 387 (2d Cir.1997) ("rejection merely frees the estate from the obligation to perform; it does not make the contract disappear") (citations omitted); see also Lieb, The Interrelationship of Trademark Law and Bankruptcy Law, 64 Am. Bankr.L.J. at 36-37 ("transfer of rights in a trademark should not be rescinded as a consequence of rejection, but, should be subject to continued enjoyment by the licensee")