Nos. 10-1175, 10-1201, 10-1352
DISH Network Corp. v. DBSD North America, Inc., Sprint Nextel Corp. v. DBSD North America, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: August 5, 2010    Decided: December 6, 2010    Opinion filed: Februay 7, 2011)

Docket Nos. 10-1175, 10-1201, 10-1352

(Consolidated for disposition)

IN RE: DBSD NORTH AMERICA, INCORPORATED,

*Debtor.*

DISH NETWORK CORPORATION,

*Creditor-Appellant,*

— v.—

DBSD NORTH AMERICA, INCORPORATED,

*Debtor-Appellee,*

AD HOC COMMITTEE OF SENIOR NOTEHOLDERS, OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

*Creditors-Appellees.*

SPRINT NEXTEL CORPORATION,

*Appellant,*

— v.—

DBSD NORTH AMERICA, INC., AD HOC COMMITTEE OF SENIOR NOTEHOLDERS, OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

*Appellees.*

————————

B e f o r e:

POOLER, RAGGI, and LYNCH, *Circuit Judges.*

————————

Appeals from a memorandum decision and order of the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*), affirming orders of the United States Bankruptcy Court for the Southern District of the United States (Robert E. Gerber, *Bankruptcy Judge*), that confirmed a plan of reorganization under 11 U.S.C. § 1129 and designated the votes of DISH Network Corporation as "not in good faith" under 11 U.S.C. § 1126(e).

AFFIRMED in part and REVERSED in part.

Judge Pooler concurs in part and dissents in part in a separate opinion.

————————

LAWRENCE BYRNE (Martin N. Flics, Paul S. Hessler, *on the brief*), Linklaters LLP, New York, NY, *for Creditor-Appellant DISH Network Corporation.*

JOHN H. CULVER III (Felton E. Parrish, *on the brief*), K&L Gates LLP, Charlotte, North Carolina, Eric T. Moser, *on the brief*, K&L Gates LLP, New York, NY, *for Creditor-Appellant Sprint Nextel Corporation.*

YOSEF J. RIEMER (James H.M. Sprayregen, Lee Ann Stevenson, *on the brief*), Kirkland & Ellis LLP, New York, NY, Marc J. Carmel, Lauren M. Hawkins, *on the brief*, Kirkland & Ellis LLP, Chicago, IL, *for Debtor-Appellee DBSD North America, Incorporated.*

THERESA A. FOUDY (Steven J. Reisman, Maryann Gallagher, *on the brief*), Curtis, Mallet-Prevost, Colt & Mosle LLP, *for Creditor-Appellee Official Committee of Unsecured Creditors.*

DENNIS F. DUNNE (Risa M. Rosenberg, *on the brief*), Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Andrew M. LeBlanc, *on the brief*, Milbank, Tweed, Hadley & McCloy LLP, Washington, DC, *for Creditor-Appellee Ad Hoc Committee of Senior Noteholders.*

EVAN M. JONES, O'Melveny & Myers LLP, Los Angeles, CA, Jennifer M. Taylor, *on the brief*, O'Melveny & Myers LLP, San Francisco, CA, Elliot Ganz, *on the brief*, Loan Syndications and Trading Association, New York, NY, *for Amicus Curiae Loan Syndications and Trading Association.*

GERARD E. LYNCH, *Circuit Judge*:

These consolidated appeals arise out of the bankruptcy of DBSD North America, Incorporated and its various subsidiaries (together, "DBSD"). The bankruptcy court confirmed a plan of reorganization for DBSD over the objections of the two appellants here, Sprint Nextel Corporation ("Sprint") and DISH Network Corporation ("DISH").

Before us, Sprint argues that the plan improperly gave shares and warrants to DBSD's owner – whose interest lies below Sprint's in priority – in violation of the

absolute priority rule of 11 U.S.C. § 1129(b)(2)(B). DISH, meanwhile, argues that the bankruptcy court erred when it found DISH did not vote "in good faith" under 11 U.S.C. § 1126(e) and when, because of the § 1126(e) ruling, it disregarded DISH's class for the purposes of counting votes under 11 U.S.C. § 1129(a)(8). DISH also argues that the bankruptcy court should not have confirmed the plan because the plan was not feasible. See 11 U.S.C. § 1129(a)(11).

On Sprint's appeal, we conclude (1) that Sprint has standing to appeal and (2) that the plan violated the absolute priority rule. On DISH's appeal we find no error, and conclude (1) that the bankruptcy court did not err in designating DISH's vote, (2) that, after designating DISH's vote, the bankruptcy court properly disregarded DISH's class for voting purposes, and (3) that the bankruptcy court did not err in finding the reorganization feasible. We therefore affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

The reader may find the full facts of this case in the decisions of both the bankruptcy court, In re DBSD North America, Inc. ("DBSD I"), 419 B.R. 179 (Bankr. S.D.N.Y. 2009); In re DBSD North America, Inc. ("DBSD II") 421 B.R. 133 (Bankr. S.D.N.Y. 2009), and the district court, In re DBSD North America, Inc. ("DBSD III"), Nos. 09-cv-10156 (LAK), 09-cv-10372 (LAK), 09-cv-10373 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010); see also In re DBSD North America, Inc. ("DBSD IV"), 427

4

B.R. 245 (S.D.N.Y. 2010) (affirming bankruptcy court's treatment of Sprint's claim). We therefore focus only on the facts most pertinent to these appeals.

ICO Global Communications founded DBSD in 2004 to develop a mobile communications network that would use both satellites and land-based transmission towers. In its first five years, DBSD made progress toward this goal, successfully launching a satellite and obtaining certain spectrum licenses from the FCC, but it also accumulated a large amount of debt. Because its network remained in the developmental stage and had not become operational, DBSD had little if any revenue to offset its mounting obligations.

On May 15, 2009, DBSD (but not its parent ICO Global), filed a voluntary petition in the United States Bankruptcy Court for the Southern District of New York, listing liabilities of $813 million against assets with a book value of $627 million. Of the various claims against DBSD, three have particular relevance here:

1. *The First Lien Debt*: a $40 million revolving credit facility that DBSD obtained in early 2008 to support its operations, with a first-priority security interest in substantially all of DBSD's assets. It bore an initial interest rate of 12.5%.

2. *The Second Lien Debt*: $650 million in 7.5% convertible senior secured notes that DISH issued in August 2005, due August 2009. These notes hold a second-priority security interest in substantially

5

all of DBSD's assets. At the time of filing, the Second Lien Debt had grown to approximately $740 million. It constitutes the bulk of DBSD's indebtedness.

3. *Sprint's Claim*: an unliquidated, unsecured claim based on a lawsuit against a DBSD subsidiary. Sprint had sued seeking reimbursement for DBSD's share of certain spectrum relocation expenses under an FCC order. At the time of DBSD's filing, that litigation was pending in the United States District Court for the Eastern District of Virginia and before the FCC. In the bankruptcy case, Sprint filed a claim against each of the DBSD entities jointly and severally, seeking $211 million. The bankruptcy court temporarily allowed Sprint's claim in the amount of $2 million for voting purposes.[1]

After negotiations with various parties, DBSD proposed a plan of reorganization which, as amended, provided for "substantial de-leveraging," a renewed focus on "core operations," and a "continued path as a development-stage enterprise." The plan provided that the holders of the First Lien Debt would receive new obligations with a four-year maturity date and the same 12.5% interest rate, but with interest to be paid in

---

[1] The bankruptcy court allowed Sprint's claim against only one of the several DBSD entities. See DBSD IV, 427 B.R. at 249-50. The court did not decide whether it mattered that Sprint's claim was allowed against only one subsidiary among several, see DBSD I, 419 B.R. at 210, and no party argues here that it makes any difference. We therefore do not reach the issue.

kind ("PIK"), meaning that for the first four years the owners of the new obligations would receive as interest more debt from DBSD rather than cash. The holders of the Second Lien Debt would receive the bulk of the shares of the reorganized entity, which the bankruptcy court estimated would be worth between 51% and 73% of their original claims. The holders of unsecured claims, such as Sprint, would receive shares estimated as worth between 4% and 46% of their original claims. Finally, the existing shareholder (effectively just ICO Global, which owned 99.8% of DBSD) would receive shares and warrants in the reorganized entity.

Sprint objected to the plan, arguing among other things that the plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B). That rule requires that, if a class of senior claim-holders will not receive the full value of their claims under the plan and the class does not accept the plan, no junior claim- or interest-holder may receive "any property" "under the plan on account of such junior claim or interest." Id. In making its objection, Sprint noted that the plan provided for the existing shareholder, whose interest is junior to Sprint's class of general unsecured claims, to receive substantial quantities of shares and warrants under the plan – in fact, much more than all the unsecured creditors received together. Sprint argued that "[b]ecause the Plan fails to satisfy" the absolute priority rule, "it cannot be confirmed."

The bankruptcy court disagreed. It characterized the existing shareholder's receipt of shares and warrants as a "gift" from the holders of the Second Lien Debt, who are

7

senior to Sprint in priority yet who were themselves not receiving the full value of their claims, and who may therefore "voluntarily offer a portion of their recovered property to junior stakeholders" without violating the absolute priority rule. DBSD I, 419 B.R. at 210. It held that it would permit such gifting "at least where, as here, the gift comes from secured creditors, there is no doubt as to their secured creditor status, where there are understandable reasons for the gift, where there are no ulterior, improper ends . . . and where the complaining creditor would get no more if the gift had not been made." Id. at 212 (footnotes and quotation marks omitted).

Meanwhile, DISH, although not a creditor of DBSD before its filing, had purchased the claims of various creditors with an eye toward DBSD's spectrum rights. As a provider of satellite television, DISH has launched a number of its own satellites, and it also has a significant investment in TerreStar Corporation, a direct competitor of DSDB's in the developing field of hybrid satellite/terrestrial mobile communications. DISH desired to "reach some sort of transaction with [DBSD] in the future if [DBSD's] spectrum could be useful in our business."

Shortly after DBSD filed its plan disclosure, DISH purchased all of the First Lien Debt at its full face value of $40 million, with an agreement that the sellers would make objections to the plan that DISH could adopt after the sale. As DISH admitted, it bought the First Lien Debt not just to acquire a "market piece of paper" but also to "be in a position to take advantage of [its claim] if things didn't go well in a restructuring."

8

Internal DISH communications also promoted an "opportunity to obtain a blocking position in the [Second Lien Debt] and control the bankruptcy process for this potentially strategic asset. " In the end, DISH (through a subsidiary) purchased only $111 million of the Second Lien Debt – not nearly enough to control that class – with the small size of its stake due in part to DISH's unwillingness to buy any claims whose prior owners had already entered into an agreement to support the plan.

In addition to voting its claims against confirmation, DISH reasserted the objections that the sellers of those claims had made pursuant to the transfer agreement, arguing, among other things, that the plan was not feasible under 11 U.S.C. § 1129(a)(11) and that the plan did not give DISH the "indubitable equivalent" of its First Lien Debt as required to cram down a dissenting class of secured creditors under 11 U.S.C. § 1129(b)(2)(A). Separately, DISH proposed to enter into a strategic transaction with DBSD, and requested permission to propose its own competing plan (a request it later withdrew).

DBSD responded by moving for the court to designate that DISH's "rejection of [the] plan was not in good faith." 11 U.S.C.§ 1126(e). The bankruptcy court agreed, finding that DISH, a competitor to DBSD, was voting against the plan "not as a traditional creditor seeking to maximize its return on the debt it holds, but . . . 'to establish control over this strategic asset.'" DBSD II, 421 B.R. at 137 (quoting DISH's own internal presentation slides). The bankruptcy court therefore designated DISH's vote

9

and disregarded DISH's wholly-owned class of First Lien Debt for the purposes of determining plan acceptance under 11 U.S.C. § 1129(a)(8). Id. at 143; DBSD I, 419 B.R. at 206.[2] The court also rejected DISH's objections to the plan, finding that the plan was feasible and that, even assuming that DISH's vote counted, the plan gave DISH the "indubitable equivalent" of its First Lien Debt claim and could thus be crammed down over DISH's dissent. DBSD I, 419 B.R. at 203, 208-09.

After designating DISH's vote and rejecting all objections, the bankruptcy court confirmed the plan. See id. at 221. The district court affirmed, see DBSD III, 2010 WL 1223109, and DISH and Sprint appealed to this Court. After oral argument, DBSD received approval from the FCC to transfer its spectrum rights to the reorganized entity – the last hurdle before consummation of the reorganization. We subsequently stayed consummation of the plan and then, on December 6, 2010, issued an order disposing of the case and vacating our stay so that the proceedings could continue below without further delay, indicating that an opinion would follow. See In re DBSD North America, Inc., 627 F.3d 496 (2d Cir. 2010). This is that opinion.

## DISCUSSION

I. **Sprint's Appeal**

Sprint raises only one issue on appeal: it asserts that the plan improperly gives

---

[2] The court did not designate DISH's vote on its Second Lien Debt claims, because DISH's stake in that class was too small to make any difference. See DBSD II, 421 B.R. at 137 n.12.

10

property to DBSD's shareholder without fully satisfying Sprint's senior claim, in violation of the absolute priority rule. See 11 U.S.C. § 1129(b)(2)(B). That rule provides that a reorganization plan may not give "property" to the holders of any junior claims or interests "on account of" those claims or interests, unless all classes of senior claims either receive the full value of their claims or give their consent. Id.; see In re Coltex Loop Cent. Three Partners, L.P., 138 F.3d 39, 42 (2d Cir. 1998); see also In re Armstrong World Indus., Inc., 432 F.3d 507, 512 (3d Cir. 2005). Because the existing shareholder received shares and warrants on account of its junior interest, Sprint argues, Sprint's class of general unsecured creditors had a right to receive "full satisfaction of their claims" or at least "an amount sufficient to obtain approval from the class." But the plan provided neither, and so Sprint asks us to vacate the order confirming it or to provide other relief that would satisfy Sprint's claim.

## A. Sprint's Standing to Appeal

Before we can address the merits of Sprint's appeal, we must decide whether Sprint has standing to bring it. The current Bankruptcy Code prescribes no limits on standing beyond those implicit in Article III of the United States Constitution. See In re Gucci, 126 F.3d 380, 388 (2d Cir. 1997). Congress has given us jurisdiction over "all final decisions, judgments, orders, and decrees" of the district courts in bankruptcy cases, 28 U.S.C. § 158(d)(1), which courts in turn have jurisdiction to review all "final judgments, orders, and decrees" of the bankruptcy courts, id. § 158(a)(1). Nevertheless,

for practical reasons this Court and others have "adopted the general rule, loosely modeled on the former Bankruptcy Act, that in order to have standing to appeal from a bankruptcy court ruling, an appellant must be 'a person aggrieved' – a person 'directly and adversely affected pecuniarily' by the challenged order of the bankruptcy court."[3] Int'l Trade Admin. v. Rensselaer Polytechnic Inst., 936 F.2d 744, 747 (2d Cir. 1991) (citation omitted). An appellant like Sprint, therefore, must show not only "injury in fact" under Article III but also that the injury is "direct[]" and "financial." Kane v. Johns-Manville Corp., 843 F.2d 636, 642 & n.2 (2d Cir. 1988).

"As a general rule," we grant standing to "creditors . . . appeal[ing] orders of the bankruptcy court disposing of property of the estate because such orders directly affect the creditors' ability to receive payment of their claims." Id. at 642; see In re Gucci, 126 F.3d at 388. In Kane, for instance, we did not hesitate to grant standing to an asbestos-injury claimant who appealed the confirmation of a plan of reorganization. The plan in that case was even more generous to the appellant than the plan in this case, since it promised him "the full amount of whatever compensatory damages he is awarded."

---

[3] "While the 'pecuniary interest' formulation is an often used and often useful test of standing in the bankruptcy context, it 'is not the only test.'" In re Zarnel, 619 F.3d 156, 162 (2d Cir. 2010), quoting In re Revco D.S., Inc., 898 F.2d 498, 499 (6th Cir. 1990). The "*public* interest" may also provide standing to appeal, as in the case of a United States Trustee, id. (emphasis in original), or the Securities and Exchange Commission, see SEC v. U.S. Realty & Improvement Co., 310 U.S. 434, 459-60 (1940). The parties here do not argue that the public interest test, or any other test besides the pecuniary interest test, is relevant to this case, so we address standing under that test alone.

Kane, 843 F.2d at 640. The Court, however, held that Kane was an aggrieved party entitled to appeal: as "a creditor, [he had] economic interests . . . directly impaired by the Plan" because the plan limited his recourse to the courts, eliminated the possibility of punitive damages, and made his recovery "subject to the Trust's being fully funded." Id. at 642. Other courts have generally found standing for impaired creditors[4] when their "interests are directly and pecuniarily affected by the order of the Bankruptcy Court." In re Combustion Eng'g, Inc., 391 F.3d 190, 223-24 (3d Cir. 2004); see also In re P.R.T.C., Inc., 177 F.3d 774, 778 (9th Cir. 1999) (noting that creditors "have a direct pecuniary interest in a bankruptcy court's order transferring the assets of the estate").

We likewise hold that Sprint has standing to appeal the confirmation of the plan in this case. Before confirmation, Sprint had a claim that the bankruptcy court valued at $2 million for voting purposes.[5] After confirmation, however, Sprint stood to receive property worth less than half (between 4% and 46%) of that amount. Therefore, confirmation of the plan affected Sprint "directly" and "financially."

The appellees challenge the above analysis from two different perspectives, looking both at the confirmation of the plan as a whole and at the gifting provision that

_____

[4] The Code treats a claim as impaired unless the plan leaves in place all rights to which the claim entitles its holder, except for certain rights to accelerate payments after default. See 11 U.S.C. § 1124.

[5] Sprint's lawsuit against a DBSD entity has not yet been resolved. The claim therefore could turn out to be worth as much as $211 million or as little as nothing, but we follow the bankruptcy court's tentative valuation for the purposes of this appeal.

Sprint protests. First, and more broadly, they argue that confirmation could not have harmed Sprint's interests because those interests were already worthless: with insufficient value in DBSD to pay off the secured creditors, Sprint's unsecured claim entitled it to nothing. Second, and more narrowly, they argue that the gift to the existing shareholder did not harm Sprint's interests because the absolute priority rule requires *either* that the objecting class receive the full value of its claim (which would more than double Sprint's recovery) *or* that junior classes receive nothing (which could lead to a reduced recovery for Sprint), so even a strict interpretation of that rule would not guarantee any benefit for Sprint. None of our cases directly address the level of generality at which we should consider standing; because we reject the appellees' analysis at both levels, however, we need not decide whether either perspective is generally preferable.

Taking the broader perspective first, we decline to withhold standing merely because the bankruptcy court's valuation of DBSD put Sprint's claim under water. By the bankruptcy court's estimate – which we accept for purposes of this appeal – DBSD is not worth enough to cover even the Second Lien Debt, much less the claims of unsecured creditors like Sprint who stand several rungs lower on the ladder of priority. But none of our prior appellate standing decisions – at least none involving creditors – have turned on estimations of valuation, or on whether a creditor was in the money or out of the money. We have never demanded more to accord a creditor standing than that it has a valid and impaired claim.

14

Cosmopolitan Aviation, the primary decision on which the appellees rely for their broader argument, is easily distinguishable.  See In re Cosmopolitan Aviation Corp., 763 F.2d 507, 513 (2d Cir. 1985), abrogated on other grounds by Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993). In that case, a state court had held that a debtor's lease had expired before it filed for bankruptcy.  Id. at 511.  The bankruptcy court found that the debtor was hopelessly insolvent, with or without the lease, and ordered the debtor's liquidation.  Id.  The debtor did not then appeal.  It appealed only a later order to turn over the land – apparently solely for purposes of delay.  Id. at 512-13.  We held that, because the debtor could no longer contest the first two rulings, it no longer had any interest in the land or even any right to "continued existence," and therefore would suffer no injury from the turn-over.  Id. at 513.  Cosmopolitan Aviation is thus a far cry from this case, where the bankruptcy court provisionally allowed Sprint's claim against the debtor, where the plan already gives Sprint some recovery, and where Sprint has appealed the adverse order directly.

The only case the appellees cite that comes close to denying a creditor standing is In re Ashford Hotels, Ltd., 235 B.R. 734 (S.D.N.Y. 1999).  But in that case the district court never accepted the appellants' attempts to characterize themselves as creditors.  Id. at 738.  The so-called creditors had sued the debtor in state court, not to win any damages but to rescind a contract under which *they* were liable to the debtor.  Id. at 736.  In the bankruptcy proceeding, they sought to stop funding the defense against their lawsuit and,

15

after losing that attempt, they appealed. Id. at 737-38. The district court found that the appellants had no interest in the debtor besides their desire to stop the defense of the rescission lawsuit and thereby thwart the debtor from collecting against them. Id. at 738. Noting that other courts had found no standing where "a party's interest in a Bankruptcy Court appeal is (only) that of a potential defendant to another lawsuit," the district court likewise denied standing to the appellants in that case, because they were not "'directly and adversely affected pecuniarily' by the Bankruptcy Court's order except as adversaries to the Debtor's estate in other litigations." Id. at 739. That case is therefore nothing like this one, where Sprint is clearly a creditor (albeit one with an unliquidated claim) and where Sprint appeals seeking to enlarge its recovery, not to head off the collection of debts against it.

The three additional district court decisions cited by the dissent are equally distinguishable. The first two do not involve creditors. In one, In re Taylor, the appellant was a chapter 7 debtor, see No. 00 Civ. 5021 (VM), 2000 WL 1634371, at *1-2 (S.D.N.Y. Oct. 30, 2000), a member of a class that often lacks standing in the bankruptcy court as well as on appeal, see In re 60 E. 80th St. Equities, Inc., 218 F.3d 109, 115-16 (2d Cir. 2000). In the other, Freeman v. Journal Register Co., it was a shareholder of the debtor who appealed. See No. 09 Civ. 7296 (JGK), 2010 WL 768942, at *3 (S.D.N.Y. Mar. 8, 2010). Although this case does not require us to address shareholder standing in bankruptcy cases, we note that some courts have been more cautious in granting standing

16

to shareholders than to creditors. See In re Troutman Enters., Inc., 286 F.3d 359, 364-65 (6th Cir. 2002). Finally, in the third case, Bartel v. Bar Harbor Airways, Inc., the appellant was a creditor, but a creditor whose claim the bankruptcy court disallowed because the debtor had already settled it. See 196 B.R. 268, 271-72 (S.D.N.Y. 1996). There is all the difference in the world between a claim that has already been disallowed by the bankruptcy court, as in Bartel, and one like Sprint's that remains allowed and pending, whatever appellate judges might guess about its chances of success. None of these decisions have any bearing on the case before us.

We think it plain that we should not forbid all appeals by out-of-the-money creditors. Such a rule would bar a large percentage of creditors in bankruptcy court, perhaps a majority of them, from ever reaching the district court or this Court, however erroneous the orders of the bankruptcy court might be. In this case, for instance, members of only two classes could appeal under the appellees' proposed rule – the holders of the First Lien Debt and Second Lien Debt – even though the plan involved twenty-six classes of claims and interests in ten different levels. The other twenty-four classes would have to be satisfied with whatever the plan awarded them. This would remain true, under the appellees' theory, even if the bankruptcy court had committed a fundamental error such as not allowing the out-of-the-money creditors to vote or not following another of the numerous requirements of § 1129. Such a result might benefit this Court's docket, but would disserve the protection of the parties' rights and the

17

development of the law.  We should not raise the standing bar so high, especially when it is a bar of our own creation and not one required by the language of the Code, which "does not contain any express restrictions on appellate standing."  Kane, 843 F.2d at 642.

The appellees try to soften the negative consequences of their proposed rule by positing that a creditor in Sprint's position may appeal if it at least argues – as Sprint did in the district court but does not in this Court – that the bankruptcy court undervalued the estate and that, under a true valuation, there was enough to cover its claim.  But that rule would not separate appropriate from inappropriate appeals by creditors; it would only increase the number of appeals involving frivolous valuation arguments.  It would turn an extremely harsh rule into an easily-evaded one.  We decline either variation of the proposed rule.

Even taking the narrower perspective, focusing not on the plan's confirmation overall but only on the "gift" to the existing shareholder that Sprint challenges under the absolute priority rule, we still find standing.  Sprint argues that the absolute priority rule entitled it to the full value of its claim before the plan could give any equity to the existing shareholder.  A plan like this one that gives property to a junior interest-holder (the existing shareholder) must provide the senior claim-holder (Sprint) with "property of a value . . . equal to the amount of [its] claim."  11 U.S.C. § 1129(b)(2)(B).  When the law requires full payment, getting less than full payment surely constitutes "direct" and "financial" injury.

The appellees respond that Sprint is entitled to nothing under the priority rules and only receives anything because it itself is the beneficiary of a gift under the plan. Rejecting this plan would not give anything to Sprint, they argue: although an alternative plan might give Sprint the full value of its claim in order to maintain the gift to the existing shareholder, an alternative plan might well cut out both Sprint and the shareholder entirely. But we rejected just such an argument in <u>Kane</u>. In that case, we accepted the possibility that the appellant, Kane, actually benefitted from the plan he was challenging and could have fared worse under alternative plans. 843 F.2d at 642. We refused, however, to allow this possibility to defeat Kane's appellate standing:

> Kane might receive more under this Plan than he would receive in liquidation. However, he might do better still under alternative plans. Since the . . . Plan gives Kane less than what he might have received, he is directly and adversely affected pecuniarily by it, and he therefore has standing to challenge it on appeal.

<u>Id</u>. at 642. We did not investigate any particular alternative plan or estimate the likelihood that a plan more advantageous to Kane would actually be adopted if the existing plan were rejected; rather, we found it sufficient for appellate standing that Kane "might" receive more under a different plan.

Here, too, Sprint "might do better still under alternative plans." <u>Id</u>. As the bankruptcy court found, "there were good business reasons for the . . . gifts" to the existing shareholder, <u>DBSD I</u>, 419 B.R. at 212 n.140, and those reasons might well lead the secured creditors to support the gift even at the price of sufficiently favorable

19

treatment for Sprint to secure its support. Put another way, if the absolute priority rule applies, Sprint may use its unsecured claim as leverage to increase its share in the reorganized entity if the "good business reasons" for the gift to the existing shareholder are still worth the cost. By rejecting the absolute priority rule, however, the bankruptcy court eliminated Sprint's leverage and reduced its potential financial recovery. To be sure, enforcing the absolute priority rule in this case would make the gift to the existing shareholder more costly to the plan proponents, who would have to pay more to Sprint in order to maintain that gift. Sprint therefore risks receiving nothing by enforcing the absolute priority rule because, if its demands outweigh the gift's perceived benefits to the senior creditors, the latter may cut out the junior classes entirely and leave nothing for Sprint. Whether such a risk is in Sprint's best interests, however, is not the issue here. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 207 (1989) ("[I]t is up to the creditors – and not the courts – to accept or reject a reorganization plan which fails . . . to honor the absolute priority rule.") For Sprint to have standing, we need only determine that, whatever the exact odds may be, Sprint at very least stands a reasonable chance of improving its position below. From whatever angle we look at the issue, therefore, we reject the appellees' challenge to Sprint's standing.

Like the appellees, our dissenting colleague does not argue that all out-of-the-money creditors lack standing to challenge a plan for violating the absolute priority rule. See Dissent. Op. at 60. Rather, adopting an approach not argued by appellees, Judge

20

Pooler finds that Sprint lacks standing because it is not only out of the money but has an unliquidated claim that might turn out to be valueless on its own merits. We do not find the ultimate merits of Sprint's claim against DBSD relevant. Standing to appeal "in no way depends on the merits" of the issue appealed, Warth v. Seldin, 422 U.S. 490, 500 (1975), and certainly cannot depend on the merits of an issue that is not before us at all. Here, the bankruptcy court allowed Sprint's claim against a DBSD entity for voting purposes, see Fed. R. Bankr. P. 3018(a), which are the only purposes that matter at this stage. The plan's supporters did not object to this ruling, did not appeal it, and do not argue that any uncertainty about the merits of Sprint's underlying claim against the debtor should deny Sprint standing. They have good reason for their silence before us, as the dissent cites no decision where standing turned on the unliquidated status of a creditor's claim, or on an appellate court's assessment of the likely merits of such a claim.

Even if it were appropriate for us to consider the merits or ultimate worth of Sprint's claim, we would have no way to make that determination, lacking any briefing from the parties or much information in the record on appeal regarding the merits of that claim, which will turn not only on the potential offset of its obligations to the government (as the dissent recognizes) but also on the date that the relevant DBSD subsidiary occupied a specific band of the transmission spectrum. See DBSD IV, 427 B.R. at 249 n.4. Because the parties do not brief the issue and did not raise it below, moreover, our evaluation of Sprint's claim would require piecing together the evidence without a guide.

21

A rule that would turn a claimant's standing to appeal a bankruptcy court's ruling on the as-yet-undetermined merits of the claimant's underlying claim would unduly complicate the standing determination, and require district and circuit courts prematurely to address the merits of issues the bankruptcy court has not yet addressed. We see no need for such an inquiry. The bankruptcy court's temporary allowance of Sprint's claim for voting purposes was enough to allow it to object below, where no one argues that Sprint lacked standing. The ultimate merits of that claim should not determine standing here, where we have less ability than the bankruptcy court to decide those merits.

Accordingly, we conclude that Sprint has standing to appeal the denial of its objection to the confirmation of the reorganization plan. We therefore turn to the merits of that objection.

**B.      Gifting and the Absolute Priority Rule**

Sprint argues that the plan violated the absolute priority rule by giving shares and warrants to a junior class (the existing shareholder) although a more senior class (Sprint's class) neither approved the plan nor received the full value of its claims. See 11 U.S.C. § 1129(b)(2)(B). The appellees respond, and the courts below held, that the holders of the Second Lien Debt, who are senior to Sprint and whom the bankruptcy court found to be undersecured, were entitled to the full residual value of the debtor and were therefore free to "gift" some of that value to the existing shareholder if they chose to. DBSD I, 419 B.R. at 210; DBSD III, 2010 WL 1223109, at *4. We recently avoided deciding the

22

viability of this "gifting doctrine" in a similar context, see In re Iridium Operating LLC, 478 F.3d 452, 460-61 (2d Cir. 2007), but we now face the question squarely. We look through the district court to the bankruptcy court's decision, and review its analysis of law *de novo*. See In re Baker, 604 F.3d 727, 729 (2d Cir. 2010).

Long before anyone had imagined such a thing as Chapter 11 bankruptcy, it was already "well settled that stockholders are not entitled to any share of the capital stock nor to any dividend of the profits until all the debts of the corporation are paid." Chi., Rock Island & Pac. R.R. v. Howard, 74 U.S. (7 Wall) 392, 409-10 (1868). In the days of the railroad barons, however, parties observed this rule in the breach. Senior creditors and original shareholders often cooperated to control the reorganization of a failed company, sometimes to make the process go smoothly – to encourage the old shareholders to provide new capital for the reorganization or to keep them from engaging in costly and delaying litigation – or sometimes simply because the senior creditors and the old shareholders were the same parties. For their cooperation, the old owners would often receive or retain some stake in whatever entity arose from the reorganization. Junior creditors, however, often received little or nothing even though they technically stood above the old shareholders in priority. See John D. Ayer, Rethinking Absolute Priority After *Ahlers*, 87 Mich. L. Rev. 963, 970-71 (1989).

In response to this practice, the Supreme Court developed a "fixed principle" for reorganizations: that all "creditors were entitled to be paid before the stockholders could

retain [shares] for any purpose whatever." N. Pac. Ry. Co. v. Boyd, 228 U.S. 482, 507-08 (1913). "[A] plan of reorganization," the Court later stated, "would not be fair and equitable which . . . admitted the stockholders to participation, unless" at very least "the stockholders made a fresh contribution in money or in money's worth in return for 'a participation reasonably equivalent to their contribution.'" Marine Harbor Props., Inc. v. Mfrs. Trust Co., 317 U.S. 78, 85 (1942), quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 121 (1939). Courts came to call this the "absolute priority rule." Ecker v. W. Pac. R.R. Corp., 318 U.S. 448, 484 (1943).

The Bankruptcy Code incorporates a form of the absolute priority rule in its provisions for confirming a Chapter 11 plan of reorganization. For a district court to confirm a plan over the vote of a dissenting class of claims, the Code demands that the plan be "fair and equitable, with respect to each class of claims . . . that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). The Code does not define the full extent of "fair and equitable," but it includes a form of the absolute priority rule as a prerequisite. According to the Code, a plan is not "fair and equitable" unless:

>          With respect to a class of unsecured claims –
>
>                    **(i)** the plan provides that each holder of a claim of such
>                    class receive or retain on account of such claim
>                    property of a value, as of the effective date of the plan,
>                    equal to the allowed amount of such claim; or
>
>                    **(ii)** the holder of any claim or interest that is junior to
>                    the claims of such class will not receive or retain under
>                    the plan on account of such junior claim or interest any

24

property . . . .

Id. § 1129(b)(2)(B). Absent the consent of all impaired classes of unsecured claimants, therefore, a confirmable plan must ensure either (i) that the dissenting class receives the full value of its claim, or (ii) that no classes junior to that class receive any property under the plan on account of their junior claims or interests.

Under the plan in this case, Sprint does not receive "property of a value . . . equal to the allowed amount" of its claim. Rather, Sprint gets less than half the value of its claim. The plan may be confirmed, therefore, only if the existing shareholder, whose interest is junior to Sprint's, does "not receive or retain" "any property" "under the plan on account of such junior . . . interest." We hold that the existing shareholder did receive property under the plan on account of its interest, and that the bankruptcy court therefore should not have confirmed the plan.

First, under the challenged plan, the existing shareholder receives "property" in the form of shares and warrants in the reorganized entity. The term "property" in § 1129(b)(2)(B) is meant to be interpreted broadly. See Ahlers, 485 U.S. at 208. But even if it were not, there is no doubt that "any property" includes shares and warrants like these.

Second, the existing shareholder receives that property "under the plan." The disclosure statement for the second amended plan, under the heading "ARTICLE IV: THE JOINT PLAN," states:

> **Class 9 – Existing Stockholder Interests**
> . . . . In full and final satisfaction, settlement, release, and
> discharge of each Existing Stockholder Interest, and on
> account of all valuable consideration provided by the Existing
> Stockholder, including, without limitation, certain
> consideration provided in the Support Agreement, . . . *the*
> *Holder of such Class 9 Existing Stockholder Interest shall*
> *receive the Existing Stockholder Shares and the Warrants.*

(emphasis added). We need not decide whether the Code would allow the existing

shareholder and Senior Noteholders to agree to transfer shares outside of the plan, for, on

the present record, the existing shareholder clearly receives these shares and warrants

"under the plan."

Finally, the existing shareholder receives its shares and warrants "on account of"

its junior interest. The Supreme Court has noted that "on account of" could take one of

several interpretations. See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St.

P'ship, 526 U.S. 434, 449 (1999). The interpretation most friendly to old equity – which

the Supreme Court rejected as "beset with troubles . . . exceedingly odd . . . [and ]

unlikely" – reads "on account of" as "in exchange for." Id. at 449-50. Even under this

generous test, the existing shareholder here receives property "on account of" its prior

junior interest because it receives new shares and warrants at least partially "in exchange

for" its old ones. The passage from the plan quoted above states as much: the existing

shareholder receives shares and warrants "[i]n full and final satisfaction, settlement,

release, and discharge of each Existing Stockholder Interest."

The gift here even more easily satisfies the two less restrictive tests the Supreme

26

Court examined (and viewed more favorably) in 203 North LaSalle, both of which read "on account of" to mean some form of "because of." Id. at 450. The existing shareholder received its property "because of," and thus "on account of," its prior interest, for the same reasons set forth above.[6]

This conclusion is not undermined by the fact that the disclosure statement recites, and the district court found, additional reasons why the existing shareholder merited receiving the shares and warrants. First, a transfer *partly* on account of factors other than the prior interest is still partly "on account of" that interest. "If Congress had intended to modify ['on account of'] with the addition of the words 'only,' 'solely,' or even 'primarily,' it would have done so." In re Coltex Loop, 138 F.3d at 43. Upholding this principle in 203 North LaSalle, the Supreme Court refused to characterize a benefit given to existing shareholders "merely as a detail of the broader transaction" in which those shareholders also contributed new capital. 526 U.S. at 456. Instead, receipt of property partly on account of the existing interest was enough for the absolute priority rule to bar

---

[6] We note that not all distributions of property to a junior class are necessarily "on account of" the junior claims or interests. For example, the Supreme Court has left open the possibility that old equity could take under a plan if it invests new value in the reorganized entity, at least as long as a "market valuation" tests the adequacy of its contribution. 203 North LaSalle, 526 U.S. at 458. In such a situation, the party receiving the property may argue – though we do not now decide the correctness of such an argument – that it does not receive anything "on account of" its interest but only on account of its new investment. For another example, our decision does not stop a senior claim-holder from receiving property on account of its senior claim just because the claim-holder also happens to hold a junior claim on account of which it receives nothing. See id. at 452 n.24. There may well be other examples.

27

confirmation of the plan. See id. at 456-58.

Second, the other reasons that the appellees assert drove the award of warrants and shares to old equity here are themselves "on account of" the existing shareholder's prior interest. The existing shareholder did not contribute additional capital to the reorganized entity, see, e.g., id. at 443 (suggesting uncertainty about whether even new capital may suffice); rather, as the bankruptcy court explained, the gift aimed to ensure the existing shareholder's "continued cooperation and assistance" in the reorganization, DBSD I, 419 B.R. at 212 n.140. The "continued cooperation" of the existing shareholder was useful only because of the shareholder's position as equity holder and "the rights emanating from that position," In re Coltex Loop, 138 F.3d at 43; an unrelated third party's cooperation would not have been useful. And "assistance" sounds like the sort of "future labor, management, or expertise" that the Supreme Court has held insufficient to avoid falling under the prohibition of the absolute priority rule. Ahlers, 485 U.S. at 204. Thus, notwithstanding the various economic reasons that may have contributed to the decision to award property to old equity here, it is clear that the existing shareholder "could not have gained [its] new position but for [its] prior equity position." In re Coltex Loop, 138 F.3d at 44.

In sum, we conclude that the existing shareholder received "property," that it did so "under the plan," and that it did so "on account of" its prior, junior interest.

The Supreme Court's interpretations of § 1129(b)(2)(B) give us confidence in

28

ours. Although that Court has not addressed the exact scenario presented here under the codified absolute priority rule, its two post-Code cases on the rule are instructive. In both cases, the prior owners tried to avoid the absolute priority rule by arguing that they received distributions not on account of their prior interests but rather on account of the new value that they would contribute to the entity. See 203 N. LaSalle, 526 U.S. at 437; Ahlers, 485 U.S. at 199. In both cases, the Supreme Court rejected those arguments. Although dictum in an earlier case had suggested that contributing new value could allow prior shareholders to participate in the reorganized entity, see Case, 308 U.S. at 121, the Court refused to decide whether § 1129(b)(2)(B) permitted such new-value exchanges. Instead, the Court held that neither "future labor, experience and expertise," Ahlers, 485 U.S. at 199 (quotation marks omitted), nor capital contributions "without benefit of market valuation," 203 N. LaSalle, 526 U.S. at 458, could suffice to escape the absolute priority rule, even assuming the ongoing validity of the Case dictum.

203 North LaSalle and Ahlers indicate a preference for reading the rule strictly. Given that the Supreme Court has hesitated to allow old owners to receive new ownership interests even when contributing new value, it is doubtful the Court would allow old owners to receive new ownership without contributing any new value, as in this case. As the Court explained in Ahlers, "the statutory language and the legislative history of § 1129(b) clearly bar any expansion of any exception to the absolute priority rule beyond that recognized in our cases at the time Congress enacted the 1978 Bankruptcy Code."

29

Ahlers, 485 U.S. at 206. The Supreme Court has never suggested any exception that would cover a case like this one.

The appellees, unsurprisingly, see the case in a different light. They contend that, under the "gifting doctrine," the shares and warrants rightfully belonged to the secured creditors, who were entitled to share them with the existing shareholder as they saw fit. Citing In re SPM Manufacturing Corp., 984 F.2d 1305 (1st Cir. 1993), the appellees argue that, until the debts of the secured creditors "are paid in full, the Bankruptcy Code's distributional priority scheme, as embodied in the absolute priority rule, is not implicated." DBSD was not worth enough, according to the bankruptcy court's valuation, to cover even the secured lenders' claims, much less those of unsecured creditors like Sprint. Therefore, as the bankruptcy court stated in ruling for the appellees, "the 'Gifting' Doctrine – under which senior secured creditors voluntarily offer a portion of their recovered property to junior stakeholders (as the Senior Noteholders did here) – defeats Sprint's Absolute Priority Rule objection." DBSD I, 419 B.R. at 210. We disagree.

Most fatally, this interpretation does not square with the text of the Bankruptcy Code. The Code extends the absolute priority rule to "any property," 11 U.S.C. § 1129(b)(2)(B)(ii), not "any property not covered by a senior creditor's lien." The Code focuses entirely on who "receive[s]" or "retain[s]" the property "under the plan," id., not on who *would* receive it under a liquidation plan. And it applies the rule to any

30

distribution "under the plan on account of" a junior interest, id., regardless of whether the distribution could have been made outside the plan, and regardless of whether other reasons might support the distribution in addition to the junior interest.

We distinguish this case from In re SPM on several grounds. In that case, a secured creditor and the general unsecured creditors agreed to seek liquidation of the debtor and to share the proceeds from the liquidation. 984 F.2d at 1307-08. The bankruptcy court granted relief from the automatic stay and converted the case from Chapter 11 to a Chapter 7 liquidation. Id. at 1309. The bankruptcy court refused, however, to allow the unsecured creditors to receive their share under the agreement with the secured creditor, ordering instead that the unsecured creditors' share go to a priority creditor in between those two classes. Id. at 1310. The district court affirmed, but the First Circuit reversed, holding that nothing in the Code barred the secured creditors from sharing their proceeds in a Chapter 7 liquidation with unsecured creditors, even at the expense of a creditor who would otherwise take priority over those unsecured creditors. Id. at 1312-19.

The first and most important distinction is that In re SPM involved Chapter 7, not Chapter 11, and thus involved a liquidation of the debtor, not a reorganization. Id. at 1309. Chapter 7 does not include the rigid absolute priority rule of § 1129(b)(2)(B). See In re Armstrong, 432 F.3d at 514. As the First Circuit noted, "the distribution scheme" of Chapter 7 "does not come into play until all valid liens on the property are satisfied." In

31

re SPM, 984 F.2d at 1312; see 11 U.S.C. § 726(a); Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 5 (2000). In re SPM repeatedly emphasized the "lack[]" of "statutory support" for the argument against gifting in the Chapter 7 context. 984 F.2d at 1313; see id. at 1313-14 (finding "no support in the Code for" rejecting gifting). Under Chapter 11, in contrast, § 1129(b)(2)(B) provides clear "statutory support" to reject gifting in this case, and the distribution scheme of Chapter 11 ordinarily distributes *all* property in the estate (as it does here), including property subject to security interests, see 11 U.S.C. § 1129(b)(2)(A).

Furthermore, the bankruptcy court in In re SPM had granted the secured creditor relief from the automatic stay, 984 F.2d at 1309, and treated the property in question as no longer part of the estate, id. at 1313. In a very real sense, the property belonged to the secured creditor alone, and the secured creditor could do what it pleased with it. Here, however, the relevant property has remained in the estate throughout, and has never belonged to the secured creditors outright. See United States v. Whiting Pools, Inc., 462 U.S. 198, 203-04 (1983). For these reasons, therefore, assuming without deciding that the First Circuit's approach was correct in the context of Chapter 7 – a question not before us – we do not find it relevant to this case. See In re Armstrong, 432 F.3d at 514 (similarly distinguishing In re SPM).

Even if the text of § 1129(b)(2)(B) left any room for the appellees' view of the case, we would hesitate to accept it in light of the Supreme Court's long history of

32

rejecting such views. That history begins at least as early as 1868, in Howard, 74 U.S. (7 Wall) 392. In that case, the stockholders and mortgagees of a failing railroad agreed to foreclose on the railroad and convey its property to a new corporation, with the old stockholders receiving some of the new shares. Id. at 408-09. The agreement gave nothing, however, to certain intermediate creditors, who sought a share of the distribution in the courts. Id. at 408.

The stockholders defended their agreement with nearly the exact logic the appellees employ here:

> The road was mortgaged for near three times its value . . . . If, then, these stockholders have got anything, it must be because the bondholders have *surrendered* a part of *their* fund to them. If the fund belonged to the bondholders, they had a right so to surrender a part or a whole of it. And if the bondholders did so surrender their own property to the stockholders, it became the private property of these last; a gift, or, if you please, a transfer for consideration from the bondholders . . . . What right have these complainants to *such* property in the hands of the stockholders?

Id. at 400. Even in 1868, however, the Supreme Court found that "[e]xtended discussion of that proposition is not necessary." Id. at 414. "Holders of bonds secured by mortgages as in this case," the Court noted, "may exact the whole amount of the bonds, principal and interest, or they may, if they see fit, accept a percentage as a compromise in full discharge of their respective claims, but whenever their lien is legally discharged, the property embraced in the mortgage, or whatever remains of it, belongs to the corporation" for distribution to other creditors. Id. Similarly, in this case, the secured creditors could have

33

demanded a plan in which they received all of the reorganized corporation, but, having chosen not to, they may not "surrender" part of the value of the estate for distribution "to the stockholder[]," as "a gift." Id. at 400. Whatever the secured creditors here did not take remains in the estate for the benefit of other claim-holders.

As the Court built upon Howard to develop the absolute priority rule, it continued to reject arguments similar to the ones the appellees make before us. For example, in Louisville Trust Co. v. Louisville, New Albany & Chicago Railway Co., the Court noted that "if the bondholder wishes to foreclose and exclude inferior lienholders or general unsecured creditors and stockholders, he may do so; but a foreclosure which attempts to preserve any interest or right of the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof." 174 U.S. 674, 683-84 (1899). The Court rejected another similar argument in 1913 in Boyd, where it finally set down the "fixed principle" that we now call the absolute priority rule. 228 U.S. at 507.

Those cases dealt with facts much like the facts of this one: an over-leveraged corporation whose undersecured senior lenders agree to give shares to prior shareholders while intermediate lenders receive less than the value of their claim. See Douglas G. Baird & Thomas H. Jackson, Bargaining After the Fall and the Contours of the Absolute Priority Rule, 55 U. Chi. L. Rev. 738, 739-44 (1988). And it was on the basis of those facts that the Supreme Court developed the absolute priority rule, with the aim of

34

stopping the very sort of transaction that the appellees propose here. See In re Iridium, 478 F.3d at 463 n.17. These old cases do not bind us directly, given that Congress has now codified the absolute priority rule. But if courts will not infer statutory abrogation of the common law without evidence that Congress intended such abrogation, see United States v. Texas, 507 U.S. 529, 534 (1993), it would be even less appropriate to conclude that Congress abrogated the more-than-a-century-old core of the absolute priority rule by passing a statute whose language explicitly adopts it.

We recognize the policy arguments against the absolute priority rule. Gifting may be a "powerful tool in accelerating an efficient and non-adversarial . . . chapter 11 proceeding," Leah M. Eisenberg, Gifting and Asset Reallocation in Chapter 11 Proceedings: A Synthesized Approach, 29 Am. Bankr. Inst. J. 50, 50 (2010), and no doubt the parties intended the gift to have such an effect here. See DBSD I, 419 B.R. at 214. As one witness testified below, "where . . . the equity sponsor is out of the money, . . . a tip is common to [e]nsure a consensual bankruptcy rather than a contested one." Enforcing the absolute priority rule, by contrast, "may encourage hold-out behavior by objecting creditors . . . even though the transfer has no direct effect on the value to be received by the objecting creditors." Harvey R. Miller & Ronit J. Berkovich, The Implications of the Third Circuit's *Armstrong* Decision on Creative Corporate Restructuring: Will Strict Construction of the Absolute Priority Rule Make Chapter 11 Consensus Less Likely?, 55 Am. U. L. Rev. 1345, 1349 (2006).

It deserves noting, however, that there are substantial policy arguments in favor of the rule. Shareholders retain substantial control over the Chapter 11 process, and with that control comes significant opportunity for self-enrichment at the expense of creditors. See, e.g., 11 U.S.C. § 1121(b) (giving debtor, which is usually controlled by old shareholders, exclusive 120-day period in which to propose plan). This case provides a nice example. Although no one alleges any untoward conduct here, it is noticeable how much larger a distribution the existing shareholder will receive under this plan (4.99% of all equity in the reorganized entity) than the general unsecured creditors put together (0.15% of all equity), despite the latter's technical seniority. Indeed, based on the debtor's estimate that the reorganized entity would be worth approximately $572 million, the existing shareholder will receive approximately $28.5 million worth of equity under the plan while the unsecured creditors must share only $850,000. And if the parties here were less scrupulous or the bankruptcy court less vigilant, a weakened absolute priority rule could allow for serious mischief between senior creditors and existing shareholders.

Whatever the policy merits of the absolute priority rule, however, Congress was well aware of both its benefits and disadvantages when it codified the rule in the Bankruptcy Code. The policy objections to the rule are not new ones; the rule has attracted controversy from its early days. Four Justices dissented from the Supreme Court's 1913 holding in Boyd, see 228 U.S. at 511, and that decision "was received by the reorganization bar and bankers with something akin to horror," James N. Rosenberg,

36

*Reorganization – The Next Step*, 22 Colum. L. Rev. 14, 14 (1922).  The Commission charged with reviewing the bankruptcy laws in the lead-up to the enactment of the Bankruptcy Code suggested loosening the absolute priority rule to allow greater participation by equity owners.  See Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 Stan. L. Rev. 70, 87-89 & n.117 (1991).  Yet, although Congress did soften the absolute priority rule in some ways,[7] it did not create any exception for "gifts" like the one at issue here.  See also H.R. Rep. 95-595, 1978 U.S.C.C.A.N. 5963, 6372 (1977) (noting that absolute priority rule was "designed to prevent a senior class from giving up consideration to a junior class unless every intermediate class consents, is paid in full, or is unimpaired").[8]  We therefore hold that the bankruptcy court erred in confirming the plan of reorganization.

II.    **DISH's Appeal**

DISH raises different objections to the bankruptcy court's order.[9]  First, DISH

---

[7] Most importantly, the Code now determines objections on a class-by-class basis, not creditor-by-creditor.  See 11 U.S.C. § 1129(b)(2)(B); Markell, 44 Stan. L. Rev. at 88.

[8]  This House Report references an earlier version of the bill, as the House Committee on the Judiciary reported it to the full House on September 8, 1977.  See B Collier on Bankruptcy App. Pt. 4(d) at 4-873, 4-988 (15th ed. 2009).  Section 1129(b)(2) received several largely stylistic changes between that version and its eventual passage, but none altered the operation of the absolute priority rule in any way relevant here.

[9]  Our conclusion with respect to Sprint's appeal in itself requires reversal of the district court's order and vacation of the bankruptcy court's confirmation of the reorganization plan.  It remains appropriate to consider DISH's appeal, however, because

37

contends that the bankruptcy court should not have designated its vote as "not in good faith," 11 U.S.C. § 1126(e), and that, even after the designation, the bankruptcy court should not have disregarded the entire class that DISH's claim comprised. Second, DISH argues that the plan should have been rejected in its entirety as not feasible. We address these arguments in turn.

**A.       The Treatment of DISH's Vote**

1.       Designating DISH's Vote as "Not in Good Faith"

To confirm a plan of reorganization, Chapter 11 generally requires a vote of all holders of claims or interests impaired by that plan. See 11 U.S.C. §§ 1126, 1129(a)(8). This voting requirement has exceptions, however, including one that allows a bankruptcy court to designate (in effect, to disregard) the votes of "any entity whose acceptance or rejection of such plan was not in good faith." Id. § 1126(e).

The Code provides no guidance about what constitutes a bad faith vote to accept or reject a plan. Rather, § 1126(e)'s "good faith" test effectively delegates to the courts the task of deciding when a party steps over the boundary. See In re Figter Ltd., 118 F.3d 635, 638 (9th Cir. 1997); see also Revision of the Bankruptcy Act: Hearing on H.R. 6439 Before the House Comm. on the Judiciary, 75th Cong. 181 (1937) ["1937 Hearing"] (statement of Jacob Weinstein) (describing "good faith" test of predecessor to § 1126(e)

_____

DISH raises distinct objections to the plan that, if accepted, would require revision of different aspects of the plan.

38

as delegation to the courts).  Case by case, courts have taken up this responsibility.  No circuit court has ever dealt with a case like this one, however, and neither we nor the Supreme Court have many precedents on the "good faith" voting requirement in any context; the most recent cases from both courts are now more than 65 years old and address § 1126(e)'s predecessor, § 203 of the Bankruptcy Act.  See Young v. Higbee Co., 324 U.S. 204 (1945); In re P-R Holding Corp., 147 F.2d 895 (2d Cir. 1945).  Nevertheless, these cases, cases from other jurisdictions, legislative history, and the purposes of the good-faith requirement give us confidence in affirming the bankruptcy court's decision to designate DISH's vote in this case.

We start with general principles that neither side disputes.  Bankruptcy courts should employ § 1126(e) designation sparingly, as "the exception, not the rule."  In re Adelphia Commc'ns Corp., 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006).  For this reason, a party seeking to designate another's vote bears the burden of proving that it was not cast in good faith.  See id.  Merely purchasing claims in bankruptcy "for the purpose of securing the approval or rejection of a plan does not of itself amount to 'bad faith.'"  In re P-R Holding, 147 F.2d at 897; see In re 255 Park Plaza Assocs. Ltd. P'ship, 100 F.3d 1214, 1219 (6th Cir. 1996).  Nor will selfishness alone defeat a creditor's good faith; the Code assumes that parties will act in their own self interest and allows them to do so.  See In re Figter, 118 F.3d at 639.

Section 1126(e) comes into play when voters venture beyond mere self-interested

promotion of their claims. "[T]he section was intended to apply to those who were not attempting to protect their own proper interests, but who were, instead, attempting to obtain some benefit to which they were not entitled." In re Figter, 118 F.3d at 638. A bankruptcy court may, therefore, designate the vote of a party who votes "in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt assets," Young, 324 U.S. at 211, or one who votes with an "ulterior motive," 1937 Hearing, supra, at 180 (statement of SEC Commissioner William O. Douglas), that is, with "an interest other than an interest as a creditor," In re P-R Holding, 147 F.2d at 897.

Here, the debate centers on what sort of "ulterior motives" may trigger designation under § 1126(e), and whether DISH voted with such an impermissible motive. The first question is a question of law that we review *de novo*, and the second a question of fact that we review for clear error, see In re Baker, 604 F.3d at 729, recognizing that "a decision that someone did or did not act in good faith" hinges on "an essentially factual inquiry and is driven by the data of practical human experience," In re Figter, 118 F.3d at 638 (quotation marks omitted).

Clearly, not just any ulterior motive constitutes the sort of improper motive that will support a finding of bad faith. After all, most creditors have interests beyond their claim against a particular debtor, and those other interests will inevitably affect how they vote the claim. For instance, trade creditors who do regular business with a debtor may

40

vote in the way most likely to allow them to continue to do business with the debtor after reorganization. See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 161-62 (3d Cir. 1993). And, as interest rates change, a fully secured creditor may seek liquidation to allow money once invested at unfavorable rates to be invested more favorably elsewhere. See In re Landing Assocs., Ltd., 157 B.R. 791, 807 (Bankr. W.D. Tex. 1993). We do not purport to decide here the propriety of either of these motives, but they at least demonstrate that allowing the disqualification of votes on account of *any* ulterior motive could have far-reaching consequences and might leave few votes upheld.

The sort of ulterior motive that § 1126(e) targets is illustrated by the case that motivated the creation of the "good faith" rule in the first place, Texas Hotel Securities Corp. v. Waco Development Co., 87 F.2d 395 (5th Cir. 1936). In that case, Conrad Hilton purchased claims of a debtor to block a plan of reorganization that would have given a lease on the debtor's property – once held by Hilton's company, later cancelled – to a third party. Id. at 397-99. Hilton and his partners sought, by buying and voting the claims, to "force [a plan] that would give them again the operation of the hotel or otherwise reestablish an interest that they felt they justly had in the property." Id. at 398. The district court refused to count Hilton's vote, but the court of appeals reversed, seeing no authority in the Bankruptcy Act for looking into the motives of creditors voting against a plan. Id. at 400.

That case spurred Congress to require good faith in voting claims. As the Supreme

Court has noted, the legislative history of the predecessor to § 1126(e) "make[s] clear the

purpose of the [House] Committee [on the Judiciary] to pass legislation which would bar

creditors from a vote who were prompted by such a purpose" as Hilton's. Young, 324

U.S. at 211 n.10. As then-SEC Commissioner Douglas explained to the House

Committee:

> We envisage that "good faith" clause to enable the courts to affirm a plan over the opposition of a minority attempting to block the adoption of a plan merely for selfish purposes. The Waco case . . . was such a situation. If my memory does not serve me wrong it was a case where a minority group of security holders refused to vote in favor of the plan unless that group were given some particular preferential treatment, such as the management of the company. That is, there were ulterior reasons for their actions.

1937 Hearing, supra, at 181-82.[10] One year after Commissioner Douglas's testimony, and

two years after the Waco case, Congress enacted the proposed good faith clause as part of

the Chandler Act of 1938. Pub. L. 75-575, § 203, 52 Stat. 840, 894. The Bankruptcy

Code of 1978 preserved this good faith requirement, with some rewording, as 11 U.S.C.

---

[10] Commissioner Douglas also described the Hilton claim-holders telling the other parties, in effect, "For a price you can have our vote." 1937 Hearing, supra, at 182. In this respect, Douglas's memory may have served him wrong, since at least the opinion of the court of appeals records nothing along these lines, unless one interprets "a price" broadly to include reinstatement of a lease or reassignment of management rights.

42

§ 1126(e).[11]

Modern cases have found "ulterior motives" in a variety of situations. In perhaps the most famous case, and one on which the bankruptcy court in our case relied heavily, a court found bad faith because a party bought a blocking position in several classes after the debtor proposed a plan of reorganization, and then sought to defeat that plan and to promote its own plan that would have given it control over the debtor. See In re Allegheny Int'l, Inc., 118 B.R. 282, 289-90 (Bankr. W.D. Pa. 1990). In another case, the court designated the votes of parties affiliated with a competitor who bought their claims in an attempt to obstruct the debtor's reorganization and thereby to further the interests of their own business. See In re MacLeod Co., 63 B.R. 654, 655-56 (Bankr. S.D. Ohio 1986). In a third case, the court found bad faith where an affiliate of the debtor purchased claims not for the purpose of collecting on those claims but to prevent confirmation of a competing plan. See In re Applegate Prop., Ltd., 133 B.R. 827, 833-35 (Bankr. W.D.

---

[11] Based on a House committee report, some have cited a further case, Aladdin Hotel Co. v. Bloom, 200 F.2d 627 (8th Cir. 1953), as an example of what the authors of the 1978 Code meant to overrule when they reenacted the good faith requirement as § 1126(e). See, e.g., In re Pleasant Hill Partners, L.P., 163 B.R. 388, 392-93 (Bankr. N.D. Ga. 1994), quoting H.R. Rep. No. 95-595, at 411 (1977). But the committee actually intended a different provision (originally designated § 1126(e), hence the confusion) to overrule Aladdin Hotel, not the good faith provision (which was originally designated § 1126(f)). When Congress removed the former provision, the latter became § 1126(e) in its place. See In re Dune Deck Owners Corp., 175 B.R. 839, 845 n.13 (Bankr. S.D.N.Y. 1995). The relevant committee report provides no insight into the good faith provision that began as § 1126(f) and became § 1126(e), instead merely paraphrasing the statutory language. H.R. Rep. No. 95-595, at 411 (1977).

Tex. 1991).

Although we express no view on the correctness of the specific findings of bad faith of the parties in those specific cases, we think that this case fits in the general constellation they form. As the bankruptcy court found, DISH, as an indirect competitor of DBSD and part-owner of a direct competitor, bought a blocking position in (and in fact the entirety of) a class of claims, after a plan had been proposed, with the intention not to maximize its return on the debt but to enter a strategic transaction with DBSD and "to use status as a creditor to provide advantages over proposing a plan as an outsider, or making a traditional bid for the company or its assets." DBSD II, 421 B.R. at 139-40. In effect, DISH purchased the claims as votes it could use as levers to bend the bankruptcy process toward its own strategic objective of acquiring DBSD's spectrum rights, not toward protecting its claim.

We conclude that the bankruptcy court permissibly designated DISH's vote based on the facts above. This case echoes the Waco case that motivated Congress to impose the good faith requirement in the first place. In that case, a competitor bought claims with the intent of voting against any plan that did not give it a lease in or management of the debtor's property. 87 F.2d at 397-99. In this case, a competitor bought claims with the intent of voting against any plan that did not give it a strategic interest in the reorganized company. The purchasing party in both cases was less interested in maximizing the return on its claim than in diverting the progress of the proceedings to achieve an outside

44

benefit. In 1936, no authority allowed disregarding votes in such a situation, but Congress created that authority two years later with cases like Waco in mind. We therefore hold that a court may designate a creditor's vote in these circumstances.

We also find that, just as the law supports the bankruptcy court's legal conclusion, so the evidence supports its relevant factual findings. DISH's motive – the most controversial finding – is evinced by DISH's own admissions in court, by its position as a competitor to DBSD,[12] by its willingness to overpay for the claims it bought,[13] by its attempt to propose its own plan, and especially by its internal communications, which, although addressing the Second Lien Debt rather than the First Lien Debt at issue here, nevertheless showed a desire to "to obtain a blocking position" and "control the

[12] Courts have been especially wary of the good faith of parties who purchase claims against their competitors. See In re MacLeod, 63 B.R. at 655; see also In re Figter, 118 F.3d at 640 (finding no bad faith in part because party was not competitor); In re 255 Park Plaza Assocs., 100 F.3d at 1219 (same); In re Pine Hill Collieries Co., 46 F. Supp. 669, 672 (E.D. Pa. 1942) (finding no bad faith even for a competitor, but only because competitor had a prior interest in the debtor).

[13] The fact that DISH bought the First Lien Debt at par is circumstantial evidence of its intent, though we do not put as much weight on the price as the bankruptcy court did. See DBSD II, 421 B.R. at 140. It is certainly true, as the Loan Syndications and Trading Association points out in an *amicus* brief, that purchasers may have many good business reasons for buying debt at par, especially when, as in this case, the debt is well secured and interest rates dropped between the original issuance of the debt and its purchase. Buying claims at or above par therefore could not provide the sole basis for designating a creditor's vote. Nevertheless, a willingness to pay high prices may tend to show that the purchaser is interested in more than the claim for its own sake. The weight to be given to such evidence is primarily an issue for the finder of fact, and we see no clear error in the bankruptcy court's reliance on the factor in this case.

45

bankruptcy process for this potentially strategic asset."

The Loan Syndications and Trading Association (LSTA), as *amicus curiae*, argues that courts should encourage acquisitions and other strategic transactions because such transactions can benefit all parties in bankruptcy. We agree. But our holding does not "shut[] the door to strategic transactions," as the LSTA suggests. Rather, it simply limits the methods by which parties may pursue them. DISH had every right to propose for consideration whatever strategic transaction it wanted – a right it took advantage of here – and DISH still retained this right even after it purchased its claims. All that the bankruptcy court stopped DISH from doing here was using the votes it had bought to secure an advantage in pursuing that strategic transaction.

DISH argues that, if we uphold the decision below, "future creditors looking for potential strategic transactions with chapter 11 debtors will be deterred from exploring such deals for fear of forfeiting their rights as creditors." But our ruling today should deter only attempts to "*obtain* a blocking position" and thereby "control the bankruptcy process for [a] potentially strategic asset" (as DISH's own internal documents stated). We leave for another day the situation in which a *preexisting* creditor votes with strategic intentions. Cf. In re Pine Hill Collieries Co., 46 F. Supp. 669, 672 (E.D. Pa. 1942). We emphasize, moreover, that our opinion imposes no categorical prohibition on purchasing claims with acquisitive or other strategic intentions. On other facts, such purchases may be appropriate. Whether a vote has been properly designated is a fact-intensive question

46

that must be based on the totality of the circumstances, according considerable deference to the expertise of bankruptcy judges. Having reviewed the careful and fact-specific decision of the bankruptcy court here, we find no error in its decision to designate DISH's vote as not having been cast in good faith.

2.    Disregarding DISH's Class for Voting Purposes

DISH next argues that the bankruptcy court erred when, after designating DISH's vote, it disregarded the entire class of the First Lien Debt for the purpose of determining plan acceptance under 11 U.S.C. § 1129(a)(8). Section 1129(a)(8) provides that each impaired class must vote in favor of a plan for the bankruptcy court to confirm it without resorting to the (more arduous) cram-down standards of § 1129(b). Faced with a class that effectively contained zero claims – because DISH's claim had been designated – the bankruptcy court concluded that "[t]he most appropriate way to deal with that [situation] is by disregarding [DISH's class] for the purposes of section 1129(a)(8)." DBSD I, 419 B.R. at 206. We agree with the bankruptcy court. Common sense demands this result, which is consistent with (if not explicitly demanded by) the text of the Bankruptcy Code.

The Code measures the acceptance of a plan not creditor-by-creditor or claim-by-claim, but class-by-class. The relevant provision explains how to tally acceptances within a class of claims to arrive at the vote of the overall class:

> A class of claims has accepted a plan if such plan has been accepted by creditors, *other than any entity designated under subsection (e) of this section*, that hold at least two-thirds in amount and more than one-half in number of the allowed

47

> claims of such class held by creditors, *other than any entity designated under subsection (e) of this section*, that have accepted or rejected such plan.

11 U.S.C. § 1126(c) (emphasis added). For each class, then, the bankruptcy court must calculate two fractions based on the non-designated, allowed claims in the class. To arrive at the first fraction, the court divides the value of such claims that vote to accept the plan by the value of all claims that vote either way. For the second fraction, the court uses the number of claims rather than their value. If the first fraction equals two-thirds or more, and the second fraction more than one-half, then the class as a whole votes to accept the plan.

The arithmetic breaks down in cases like this one. Because the only claim in DISH's class belongs to DISH, whose vote the court designated, each fraction ends up as zero divided by zero. In this case, the plain meaning of the statute and common sense lead clearly to one answer: just as a bankruptcy court properly ignores designated *claims* when calculating the vote of a class, see 11 U.S.C. § 1126(e), so it should ignore a wholly designated *class* when deciding to confirm a plan under § 1129(a)(8).[14] We agree with the bankruptcy court that any other rule "would make [the] designation ruling

_____

[14] We state no conclusion on whether the same result is appropriate for other tests that the Code imposes, such as in §§ 1129(a)(7) and 1129(a)(10). We likewise do not decide how the bankruptcy court should treat classes in which no creditor files a timely vote. Compare In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1266 (10th Cir. 1988) (holding that debtor's "inaction constituted an acceptance of the Plan"), with In re M. Long Arabians, 103 B.R. 211, 215-16 (B.A.P. 9th Cir. 1989) (holding that "[t]he holder of a claim must affirmatively accept the plan").

meaningless" in this context. <u>DBSD I</u>, 419 B.R. at 206.[15] We therefore affirm the bankruptcy court's treatment of DISH's class.

### 3. Indubitable Equivalence

Finally, because we affirm the bankruptcy court's treatment of both DISH's vote and its class's vote, we do not reach that court's alternative theory that it could cram the plan down over DISH's objection because DISH realized "the indubitable equivalent" of its First Lien Debt under the plan. 11 U.S.C. § 1129(b)(2)(A)(iii).

### B. The Feasibility of the Plan

To confirm a plan under Chapter 11, a bankruptcy court must find that the plan is feasible, or, more precisely, that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). DISH argues that the feasibility of this plan is "purely speculative" and that the bankruptcy court therefore should not have confirmed it. We review a finding of feasibility only for clear error, <u>see</u> <u>In re Webb</u>, 932 F.2d 155, 158 (2d Cir. 1991), and we find none here.

---

[15] DISH argues that "[t]he plain language of section 1126(c) dictates that in order for a class to be deemed to have accepted a plan of reorganization, it must have actively voted in favor of the plan," and that, because "the votes of any entity designated . . . are excluded from both the numerator and denominator in determining whether a class has accepted a plan," DISH's class cannot be found to have voted in favor of the plan. This makes no sense. A class with no qualifying members cannot be required to accept a plan by an affirmative vote.

For a plan to be feasible, it must "offer[] a reasonable assurance of success," but it need not "guarantee[]" success. Kane, 843 F.2d at 649. Some possibility of liquidation or further reorganization is acceptable and often unavoidable. The bankruptcy court applied this standard and found this plan feasible based primarily on four factors. DBSD I, 419 B.R. at 201-03.

First, the plan "dramatically deleverage[s]" DBSD. Id. at 202; see In re Piece Goods Shops Co., 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995). Before bankruptcy, DBSD owed over $800 million; the projected debt of the reformed DBSD would be as low as $260 million as late as 2013. Given the bankruptcy court's valuation of a reorganized DBSD as worth between $492 million and $692 million, this debt reduction makes a big difference.

Second, the court found it likely that DBSD would be able to obtain the capital it needs. DBSD has already received commitments for a credit facility to provide working capital for the first two years. DBSD I, 419 B.R. at 203. After two years, DBSD would need further capital, but the court found "very reasonable" the possibility that DBSD will be able to secure either more financing or a strategic investor. Id. As evidence of this possibility, the court pointed to expert testimony, actual offers that had been made (including DISH's own offer), and the ability of similar companies to access the capital markets. The court also noted the likely attractiveness to future investors of DBSD's control over 20MHz of prime bandwidth, a "finite" and "very valuable" resource. Id. at

50

194.

Third, the court found little risk of default on DBSD's secured obligations to DISH, and still less risk that any such default would lead to the liquidation or financial reorganization that § 1129(a)(11) seeks to avert. Id. at 203. The plan makes the interest on DISH's First Lien Debt, which had been payable in cash, payable only in kind, with no cash due for four years. This feature buys DBSD breathing room to shore up its position before it becomes necessary to secure significant additional capital, as described above.

Fourth, and finally, the bankruptcy court noted that general credit markets at the time of its decision in October 2009 had improved from their low a year before. Id. Although no one can predict market conditions two or four years down the road, the improvement the bankruptcy court noted was real, and increased the likelihood that DBSD will be able to repay its creditors.

Based on all of these factors, the bankruptcy court found the plan of reorganization feasible. Id. We find the bankruptcy court's analysis thorough and persuasive. DISH's arguments to the contrary do not successfully identify any clear error in it.

First, DISH argues that the bankruptcy court employed the wrong legal standard. DISH claims that a bankruptcy court cannot confirm a plan unless the proponents prove "specifics . . . as to how the Debtors would be able to meet their repayment obligations at the end of the Plan period." That is true at some level of generality, but exactly how specific those "specifics" must be depends on the circumstances. In most situations, the

51

time immediately following bankruptcy will call for fairly specific proof of the company's ability to meet its obligations – as here, where it was "undisputed that the Debtors have commitments for working capital financing for the next two years." DBSD I, 419 B.R. at 203. As one moves further away from the time of confirmation, however, the proof will necessarily become less and less specific. Had DBSD's plan called for the issuance of 20-year notes, for instance, no one would expect specifics about the sort of financing it might get in year 19. When a court is dealing with an intermediate time frame like the four years after which the balloon payment comes due in this case, the level of proof required will be somewhere in the middle. In this context, the bankruptcy court based its feasibility finding on sufficiently specific proof to conclude that DBSD would be likely to avoid reorganization or liquidation even after four years. Overall, the bankruptcy court both stated and applied the correct standard in this case, dooming DISH's legal challenge.

Second, DISH argues that the district court clearly erred in its fact-finding. At most, DISH's arguments on this front demonstrate that there is some chance that DBSD might eventually face liquidation or further reorganization. But that small chance does not change the feasibility analysis, which requires only a "reasonable assurance of success," not an absolute "guarantee[]." Kane, 843 F.2d at 649. A small or even moderate chance of failure does not mean that the plan is "*likely* to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C.

52

§ 1129(a)(11) (emphasis added).  We therefore uphold the bankruptcy court's feasibility determination.

**CONCLUSION**

For the reasons set forth above, we REVERSE the order of confirmation on absolute-priority grounds, AFFIRM on all other grounds, and REMAND for further proceedings consistent with this opinion.

POOLER, *Circuit Judge, concurring in part, dissenting in part*.

I join Judge Lynch's thoughtful opinion affirming the Bankruptcy Court's and District Court's orders concerning the appeal of DISH Network Corporation ("DISH"). I, however, respectfully dissent from the portion of the opinion granting appellate standing to Sprint Nextel Corporation ("Sprint").

The question before us is whether Sprint, an out-of-the-money unsecured creditor with an unliquidated claim, has standing to challenge a Chapter 11 confirmation plan (the "Plan") approved by all the creditors save the two who are before us, and affirmed by the bankruptcy and district courts below. *See DBSD II*, 421 B.R. 133 (Bankr. S.D.N.Y. 2009); *DBSD III*, No. 09-civ-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010). On appeal, Sprint raises only one argument: that a provision of the Plan allowing for a "gift" from the senior noteholders to the existing stockholder violates the absolute priority rule.

## BACKGROUND

Sprint brings before this Court a claim initially brought against debtor New Satellite Services ("New Satellite"). New Satellite is one of the debtors that joined together to form a business still in the developmental stage, for the purpose of providing mobile satellite services. DBSD, North America, Inc. ("DBSD"), the lead debtor, is a holding company and the direct or indirect corporate parent of the other debtors, including New Satellite. *See DBSD IV*, 427 B.R. 245, 249 (S.D.N.Y. 2010). Sprint's

54

complaint against New Satellite initially sought to recoup the costs of Sprint's relocation to a 2-gigahertz spectrum band ("2 GHz band"). Sprint alleged New Satellite owed Sprint its pro rata share of band clearing costs. Significantly, Sprint did not name the other debtors as defendants in its complaint, nor did it seek to hold the debtors jointly and severally liable for the reimbursement obligation. *See DBSD IV*, 427 B.R. at 249. This changed after the debtors, including New Satellite, filed for bankruptcy. Shortly thereafter, Sprint filed nine identical proofs of claim in the Chapter 11 cases against each of the nine debtors, claiming that they were jointly and severally liable to Sprint for the full claim amount of at least $1.9 billion. *See id.* The $1.9 billion represented a nineteen-fold increase over the $100 million Sprint had initially sought in its complaint against New Satellite. *See id.* The bankruptcy court rejected Sprint's claim of joint and several liability, and the district court affirmed this order on appeal. *See id.* at 254-55.

Before rejecting Sprint's claim of joint and several liability, the bankruptcy court temporarily allowed Sprint's claim for voting purposes only in the amount of $2 million. *In re DBSD North America, Inc.*, Case No. 09-13061 (REG) (Sept. 11, 2009); *see also DBSD I*, 419 B.R. 179, 203-04 (S.D.N.Y. 2009). The bankruptcy court tentatively reached this decision, given that Sprint had not--and still has not--provided any documentation of the expenditures it claims it is owed. The bankruptcy court also noted that the 2 GHz band that Sprint acquired is so valuable that Sprint must make an anti-windfall payment to the United States Treasury in the amount of $2.8 billion. *In re*

55

*DBSD North America, Inc.*, Case No. 09-13061 (REG) (Sept. 30, 2009). Moreover, the relocation agreement provided that Sprint could deduct any unrecouped band-clearing costs from the $2.8 billion anti-windfall payment; it appeared to the court that Sprint had not taken its ability to offset into account when calculating its damages. *Id.* Thus, there is a very real possibility that Sprint's as-of-yet-undetermined relocation costs may be paid for in full without necessitating any recourse to DBSD. The bankruptcy court emphasized that Sprint's $2 million claim was temporarily allowed "for voting purposes (*and those alone*)." *Id.* (emphasis added).

Twenty-four classes of claims ultimately voted in favor of the confirmation plan. Sprint and DISH were the only two creditors to object. Because DISH's votes were designated, Sprint--holding a contingent, disputed, and unliquidated claim-- singlehandedly prevented the confirmation of a Plan that would have resulted in a reorganized entity worth between an undisputed $ 492 million to $692 million. *DBSD I*, 419 B.R. at 200.

## DISCUSSION

The preliminary issue raised on appeal is whether Sprint has standing before this Court. If so, then the merits of its sole claim on appeal must be addressed–whether a gift from the senior noteholders to the existing stockholder and unsecured creditors, including Sprint, violates the absolute priority rule. Because I do not believe that Sprint has standing, I do not reach the merits of Sprint's challenge.

56

Standing is raised for the first time before this Court, as Sprint had standing below based on its challenge to the bankruptcy court's valuation of the estate. Sprint abandoned its position contesting the bankruptcy court's valuation on appeal, thus raising the question of whether an out-of-the-money, unsecured creditor with an unliquidated claim has standing.[1]

The claims initially allowed in a bankruptcy proceeding are broad under the language of 11 U.S.C. § 101(4), and it is well-settled within our Circuit that the definition of such a claim "is to have wide scope." *In re Chateaugay Corp.*, 944 F.2d 997, 1002-03 (2d Cir. 1991). Our Circuit has, however, purposely and periodically restricted appellate standing in bankruptcy proceedings. *See In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997) (explaining that "[t]he stringency of our rule is rooted in a concern that freely granting open-ended appeals to those persons affected by bankruptcy court orders will sound the death knell of the orderly disposition of bankruptcy matters"). Accordingly, the equally well-settled rule concerning appellate standing is that merely being a party to a bankruptcy proceeding does not confer appellate standing to challenge the confirmation of a reorganization plan. *See In re Cosmopolitan Aviation Corp.*, 763 F.2d 507, 513 (2d Cir. 1985), *abrogated on other grounds by Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993). Although creditors generally have standing to

---

[1] The Court's distinction between the levels of generality at which Sprint's standing can be considered, is largely academic: if we hold Sprint has no standing to appeal based on the lack of direct and adverse pecuniary effect, there is no standing to appeal either the Plan generally, or one provision of the Plan in particular.

57

challenge orders that affect estate property, *see Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988), "[t]his general rule is based upon the assumption that 'that sort of order directly affects the funds available to meet their claims.'" *In re Ashford Hotels, Ltd.*, 235 B.R. 734, 738 (S.D.N.Y. 1999) (quoting *In re Gucci*, 126 F.3d at 388). Where an order has *no* effect on the funds available to meet a creditor's claims – where the creditor is not "directly and adversely affected pecuniarily by the challenged order" – then appellate standing is lacking. *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (internal quotation marks omitted). Thus, notwithstanding the opinion issued today, courts within our jurisdiction have analyzed the "aggrieved person" standard sufficient to confer standing, by looking to whether the appellant at issue would receive any money under the Plan, or under the valuation of the estate. *See Freeman v. Journal Register Co.*, No. 09 Civ. 7296, 2010 WL 768942, at *3 (S.D.N.Y. Mar. 8, 2010); *In re Taylor*, No. 00 Civ. 5021, 2000 WL 1634371, at *2 (S.D.N.Y. Oct. 30, 2000); *Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268, 271-72 (S.D.N.Y. 1996); *see also In re Ashford Hotels*, 235 B.R. at 738.

The situation before us, however, includes an additional wrinkle not addressed by today's opinion: Sprint is not merely an out-of-the-money unsecured creditor, but its alleged direct and adverse pecuniary effect is based entirely on an unliquidated claim. That is, not only does Sprint get nothing under the Plan as an unsecured creditor, but as of today, Sprint has failed to demonstrate it is entitled to a single cent from DBSD, much

58

less $2 million.

Sprint's argument that it has standing to appeal the confirmation order because it "might do better still under alternative plans" thus remains entirely speculative. Despite the indisputably weak foundation of Sprint's request, I address its misguided reliance on *Kane*, which Sprint interprets to mean that showing one "might" do better under an alternative plan is all that is required for standing. Sprint and the Court both misinterpret *Kane*. First, *Kane* reiterated the rule that standing in a bankruptcy appeal requires a showing of direct and adverse pecuniary effect. 843 F.2d at 641 (quoting *Cosmopolitan Aviation*, 763 F.2d at 513). Second, *Kane* did not disturb the general rule that a showing of pecuniary injury requires more than mere speculation that a party *might* have been better off with alternatives that could have been pursued. *See In re Joint E. and S. Dist. Asbestos Litig.*, 78 F.3d 764, 779 (2d Cir. 1996). Third, the plaintiff in *Kane* was not in line behind undersecured senior creditors. In *Kane*, there was "a sum well in excess of $600 million" set aside to satisfy the unsecured claims of asbestos victims. *See In re Johns-Manville Corp.*, 66 B.R. 517, 528 (1986). Thus, it was not mere speculation in *Kane* that the plaintiff could have done better under alternative plans because it was undisputed that the plaintiff was entitled to *something*. Here, in stark contrast, senior creditors are unsecured by over $100 million and Sprint has been unable to demonstrate it is owed *anything*.

While it may be true that our Court should not bar all appeals from out-of-the

money unsecured creditors, I , respectfully, cannot join an opinion that characterizes Sprint as a run-of-the-mill, out-of-the-money, unsecured creditor who has been "pecuniarily affected." The opinion does not adequately address the facts before the Court, nor a possibility inherent in today's ruling, that a creditor with a claim as tangential as Sprint's may succeed in preventing the reorganization of an entity that may ultimately owe it nothing.

I decline to decide on the facts of this case whether an out-of-the-money creditor must take an appeal from a valuation decision to have standing. Indeed, I find it is less significant that Sprint failed to pursue its challenge to the bankruptcy court's factual findings regarding the estate's valuation, than that it failed to prove it is owed any amount of money in the first instance. In this regard Sprint is more akin to the creditors in *In re Ashford*, 235 B.R. 734, than the Court acknowledges, distinguishing that case on the basis that the *Ashford* court "never accepted the appellants' attempts to characterize themselves as creditors." While *In re Ashford* specifically involved a party whose interest in the bankruptcy proceeding was that of a potential defendant to another lawsuit, Sprint's situation is nevertheless analogous in that it has similarly been unable to demonstrate an affirmative interest in the bankruptcy proceeding. Moreover, *In re Ashford* firmly supports the proposition that "the Second Circuit has made it clear that the parties who should be able to appeal Bankruptcy Court Orders are limited." 235 B.R. at 739 (citing *Kane*, 843 F.2d at 642).

Insofar as the Court characterizes the above discussion as addressing "the ultimate merits of Sprint's claim," the Court misunderstands the purpose of such a discussion. The question before us is whether Sprint has standing--that is, whether Sprint has been "directly and adversely affected pecuniarily by the challenged order," *Rensselaer*, 936 at 747. The answer *requires* identifying the nexus between Sprint and the bankruptcy proceeding in the first instance, as it is a task of Herculean proportions to find that a pecuniary interest has been adversely affected where no loss has been identified, and no connection to the bankruptcy proceeding established. The silence on this issue is, as the Court indicates, telling-- yet it is more a testament to the oddity of the claim before us, than to the propriety of the standing analysis.

While the Court relies heavily on the fact that the parties did not brief the issue in the specific context of standing, our decision is based on the facts provided by the parties themselves. And just as the Court relies on the bankruptcy court's emphatically temporary allowance of Sprint's claim in its decision, I rely on the facts set forth by both parties, as found by two different courts below us, which neither party claims were clearly erroneous. *In re Baker*, 604 F.3d 727, 729 (2d Cir. 2010). Indeed, I find it difficult to agree with a rule which disregards the very genesis of the claim upon which Sprint stands before us now, in determining how, and to what extent, its interests are directly and pecuniarily affected.

Under no reasonable understanding of Sprint's claim can it show that it suffered a

pecuniary injury as a result of the confirmation plan. Accordingly, Sprint should not have standing before this Court. For these reasons, I respectfully dissent.